**UNITED STATES DISTRICT COURT**
**DISTRICT OF DISTRICT OF COLUMBIA**

AUSTIN SANCTUARY NETWORK
14311 Wells Port Dr.
Austin, TX, 78728;

FIRST UNITARIAN CHURCH OF
SALT LAKE CITY
569 S. 1300 E.
Salt Lake City, UT 84102

FREE MIGRATION PROJECT
150 Cecil B. Moore Ave., Suite 203
Philadelphia, PA 19122;

MARÍA CHAVALÁN SUT
1901 Thomson Rd
Charlottesville, VA 22903;

VICKY YULISSA CHÁVEZ-FINO
11715 State St., Apt N202
Draper, UT 84020;

EDITH ESPINAL MORENO
4763 Palmetto St.
Columbus, OH 43228;

HILDA VERONICA RAMIREZ-MENDEZ
14311 Wells Port Dr.
Austin, TX 78728,

                    *Plaintiffs*,

            v.

ALEJANDRO MAYORKAS
Secretary of United States Department of
Homeland Security
Office of the General Counsel
2707 Martin Luther King Jr. Ave. SE
Washington, DC 20528-0485,
in his official capacity;

**SECOND AMENDED**
**COMPLAINT**
No. 1:21-cv-00164-TFH

**TRIAL BY JURY DEMANDED**

TAE JOHNSON
Acting Director of United States Immigration and
Customs Enforcement
Office of the Principal Legal Advisor
500 12th St. SW, Mail Stop 5900
Washington, DC 20536-5900,
in his official capacity;

JANE OR JOHN DOES 1-6
Officers of United States Department of Homeland
Security,
in their official and individual capacities;

JANE OR JOHN DOES 7-12
Officers of United States Immigration and Customs
Enforcement,
in their official and individual capacities;

UNITED STATES DEPARTMENT OF
HOMELAND SECURITY
Office of the General Counsel
2707 Martin Luther King Jr. Ave. SE
Washington, DC 20528-0485;

UNITED STATES IMMIGRATION AND
CUSTOMS ENFORCEMENT
Office of the Principal Legal Advisor
500 12th St. SW, Mail Stop 5900
Washington, DC 20536-5900;

UNITED STATES OF AMERICA,

*Defendants*.

## PRELIMINARY STATEMENT

1.  Plaintiffs Austin Sanctuary Network ("ASN"), First Unitarian Church of Salt Lake City

("First Unitarian"), Free Migration Project ("FMP"), (together, the "Organizational Plaintiffs"),

María Chavalán Sut, Vicky Yulissa Chávez-Fino, Edith Espinal Moreno, and Hilda Veronica

Ramirez-Mendez (collectively, "Individual Plaintiffs"),[1] bring this action pursuant to the First and Eighth Amendments to the Constitution and the Religious Freedom Restoration Act seeking declaratory relief and injunctive relief against Defendants U.S. Department of Homeland Security ("DHS"), its subcomponent U.S. Immigration and Customs Enforcement ("ICE"), Acting DHS Secretary Alejandro Mayorkas, and Acting ICE Director Tae Johnson; and similar equitable relief as well as damages against DHS officials "Jane and  John Doe 1-6" and ICE officials "Jane and John Doe 7-12" (collectively, "Defendants"). The Individual Plaintiffs additionally seek monetary damages against the Defendant the United States pursuant to the Federal Tort Claims Act, (FTCA), 28 U.S.C. §§ 2671, *et seq.*

2.     These claims arise because Defendants have intentionally and recklessly targeted Individual Plaintiffs and selectively issued them exorbitant civil immigration fines as leaders of the sanctuary movement ("sanctuary leaders") because they have taken sanctuary from unjust and punitive orders of deportation in houses of worship in the U.S. and advocate for sanctuary policies based on their deeply held religious beliefs. Trump Administration officials have selectively targeted Individual Plaintiffs—all of whom are indigent women who came to the U.S. seeking asylum from persecution—with fines of approximately $60,000 each in order to punish them for objecting to the government's inhuman deportation practices with their faith communities. In order to respond to these Trump Administration practices against sanctuary leaders, the Organizational Plaintiffs have had to divert resources and alter their missions.

3.     Although the Immigration and Nationality Act ("INA") has authorized the use of civil immigration fines for failing to depart the U.S. since 1952,[2] the United States, through these

---

[1] The Organizational Plaintiffs and Individual Plaintiffs together are referred to as "Plaintiffs."

[2] *See, e.g.*, INA § 274D, 8 U.S.C. § 1324d.

Defendants, only began enforcing these provisions against Plaintiffs after President Donald J. Trump signed Executive Order No. 13768 in 2017, calling on the Secretary of Homeland Security to "ensure the assessment and collection of all fines and penalties . . . from aliens unlawfully present in the United States and from those who facilitate their presence in the United States."[3] President Trump's Senior Advisor Stephen Miller expressed early interest in the use of civil immigration fines.[4] President Trump's first ICE Director Thomas Homan issued Directive 10088.1, which set forth the agency's policy regarding the assessment and collection of civil immigration fines.[5] In executing the policy, Trump Administration officials became fixated on sanctuary leadership because of their open and religious objection to the immorality of its xenophobic and cruel immigration policies, and targeted them for ridicule and punishment.

4.     Defendants, including a series of unnamed ICE officials tasked with identifying people to fine, proceeded to enforce the new directive selectively—targeting several sanctuary leaders whose activism received widespread public attention with the most exorbitant fines, initially ranging from roughly $200,000 to $500,000 dollars.[6] Defendants subsequently rescinded

---

[3] Executive Order No. 13768, 82 Fed. Reg. 8799 (Jan. 25, 2017).

[4] *See* AMERICAN OVERSIGHT, *In The Documents: Stephen Miller Emails With Justice Department Official About Anti-Immigration Measures*, July 23, 2020, https://www.americanoversight.org/in-the-documents-stephen-miller-email.

[5] U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, Directive 10088.1: Fines and Penalties for Civil Violations of Immigration Law, DO-01-2018 (June 19, 2018), https://ccrjustice.org/sites/default/files/attach/2020/10/Sanctuary%20FOIA%20Doc%202%20-%20Homan%20Directive%20on%20ICE%20Procedures%20for%20Implementing%20Civil%20Fines.pdf.

[6] *See, e.g.,* Elizabeth Dias, *Ordered Deported, Then Sent a $497,777 Fine From ICE*, N.Y. TIMES, July 4, 2019, https://www.nytimes.com/2019/07/04/us/migrants-deportation-fines.html; Stephanie Ebbs and Anne Flaherty, *ICE Issuing Fines to Immigrants Who Have Taken Sanctuary in Churches*, ABC NEWS, July 2, 2019, https://abcnews.go.com/Politics/ice-issuing-fines-immigrants-sanctuary-churches/story?id=64094018; Saja Hindi, *Colorado Immigrant Seeking Sanctuary Imposed Penalty for not Leaving the United States*, DENVER POST, July 3, 2019, https://www.denverpost.com/2019/07/03/colorado-immigrant-sanctuary-ingrid-encalada-latorre-ice/; Franco Ordoñez, *Trump Administration Hits Some Immigrants In U.S. Illegally With Fines Up To $500,000*, NATIONAL PUBLIC RADIO, July 2, 2019, https://www.npr.org/2019/07/02/738059913/trump-administration-sends-out-notices-of-500-000-fines-for-those-in-u-s-illegal; Christine Bolaños, *Mother and Son In Church Sanctuary For 3-Plus Years Prevail Amid Increasing Fines, Deportation Threats*, LATINO USA, July 31, 2019,

some of the fines in order to issue new notices requiring sanctuary leaders to report to ICE for supervision and deportation and—as sanctuary leaders' condemnation of the fines made headlines—re-issued fine notices against the sanctuary leaders[7] in a publicized campaign that pressured the Plaintiffs to leave sanctuary.[8]

5.      Defendants' actions have injured Individual Plaintiffs Ms. Chavalán Sut, Ms. Chávez, Ms. Espinal, and Ms. Ramirez, sanctuary leaders against whom ICE has issued fines. Before ICE issued its first civil fines, Individual Plaintiffs had taken sanctuary in houses of worship, were advocating for sanctuary policies with their faith communities, and were organizing other faith communities to join in these efforts, based on their deeply held religious beliefs. Individual Plaintiffs believe that they have a religious duty to welcome the stranger (Matthew 25:35 "I was a stranger and you welcomed me.") and to participate collectively to prevent vulnerable human beings and their families from being sent back to countries and conditions that

---

https://www.latinousa.org/2019/07/31/motherandson/; Russ Bowen, *Immigrant taking sanctuary at Chapel Hill church among many nationwide facing hefty fines*, CBS 17, Aug. 26, 2019, https://www.cbs17.com/news/local-news/orange-county-news/immigrant-taking-sanctuary-at-chapel-hill-church-among-many-facing-hefty-fines/; Regina Garcia Cano, *Immigrants taking sanctuary in churches hit with huge fines,* THE ASSOCIATED PRESS, July 30, 2019, https://www.apnews.com/e8ff5f53c5ed4c24a2a533d56e910771; Yonat Shimron, *Sanctuary churches say fines against immigrants meant to sow fear*, RELIGION NEWS, July 3, 2019, https://religionnews.com/2019/07/03/sanctuary-churches-say-fines-against-immigrants-meant-to-sow-fear/; Teo Armus, *She took refuge in a Chapel Hill church from ICE. Now, she could be fined $314,000*, CHARLOTTE OBSERVER, July 17, 2019, https://www.charlotteobserver.com/news/state/north-carolina/article232462202.html.

[7] At least one person "self-departed" after receiving one of the initial, exorbitant fines and before the new notices of intent to fine were reissued. Stephen Dinan, EXCLUSIVE: ICE revives six-figure fines against illegal immigrants living in sanctuary, WASHINGTON TIMES, Dec. 7, 2019, https://www.washingtontimes.com/news/2019/dec/7/exclusive-ice-moves-revive-six-figure-fines-agains/. Another individual subsequently won her immigration case.

[8] *ICE withdraws big fines for immigrants taking sanctuary in churches*, NATIONAL BROADCASTING COMPANY, Oct. 24, 2019, https://www.nbcnews.com/news/latino/ice-withdraws-big-fines-immigrants-taking-sanctuary-churches-n1071236; Stephen Dinan, EXCLUSIVE: *ICE revives six-figure fines against illegal immigrants living in sanctuary*, WASHINGTON TIMES, Dec. 7, 2019, https://www.washingtontimes.com/news/2019/dec/7/exclusive-ice-moves-revive-six-figure-fines-agains/.

would threaten their lives or wellbeing. As such, they believe that they have a religious duty to participate in the sanctuary movement and advocate individually and collectively on behalf of themselves and their families, and for immigrant rights broadly. Defendants' actions have had a chilling effect on the protected speech and associational rights of Individual Plaintiffs, have burdened the exercise of their faith, and have impeded their ability to organize other faith communities and families who are frightened from speaking out due to Defendants' aggressive efforts.

6.     Additionally, Defendants' actions have psychologically injured the Individual Plaintiffs, causing severe emotional distress. Individual Plaintiffs suffered acute stress and worsened existing psychological conditions, leading to decompensation in physical and mental health. Defendants' actions have also injured Organizational Plaintiffs Austin Sanctuary Network ("ASN"), First Unitarian Church of Salt Lake City ("First Unitarian"), and Free Migration Project ("FMP"). ASN is a faith-based coalition that supports immigrants and participates in the broader, religiously grounded sanctuary movement. It includes several members, including St. Andrew's Presbyterian Church where Ms. Ramirez resides. First Unitarian is a Salt Lake City-based church committed to human rights and social justice where Ms. Chávez is currently living in sanctuary. First Unitarian sees support for immigrants as a religious mandate outlined in Leviticus 19 ("You shall not do harm to sojourners in your land. He shall be as native among you, and you shall love him as yourself.") and Hebrews 13 ("Do not neglect to give hospitality to strangers."). First Unitarian has been a sanctuary church since 2008. FMP is a nonprofit organization that provides legal and strategic support to undocumented organizers fighting for immigrant rights. It has coordinated the defense of sanctuary leaders facing civil fines.

7.      As part of their missions, ASN, First Unitarian, and FMP support the National Sanctuary Collective, a group of sanctuary leaders including Individual Plaintiffs, along with other immigrant organizers, attorneys, and allies in faith communities across the country who seek to transform U.S. immigration policies. Due to Defendants' retaliatory and punitive issuance of exorbitant civil fines against several sanctuary leaders who participate in the National Sanctuary Collective, ASN, First Unitarian, and FMP have been forced to divert scarce resources away from supporting the Collective's broader policy work in order to coordinate sanctuary leaders' civil fines public advocacy and legal defense strategy.

8.      The intentional targeting of sanctuary leaders, the vast majority of whom are asylum-seeking women, for punitive immigration fines violates Plaintiffs' First Amendment right to Free Speech and Association and Organizational Plaintiffs ASN and First Unitarian's and Individual Plaintiffs' First Amendment right to Free Exercise of Religion. Because the fines impose a substantial burden on Plaintiffs' religious beliefs absent a narrowly tailored and compelling government interest, the fines also violate Organizational Plaintiffs ASN and First Unitarian's and Individual Plaintiffs' religious beliefs rights under the Religious Freedom Restoration Act (RFRA) entitling them to an injunction and damages. Because the fines are punitive, retaliatory, and wildly disproportionate to any legitimate government interest, they violate the prohibition on Excessive Fines in the Eighth Amendment. Finally, because of the outrageous and extreme imposition of fines, the actions of the Individual Defendants, acting within the scope of their federal employment, caused severe emotional distress. Consequently, under the FTCA, the United States is liable to Individual Plaintiffs in damages. Plaintiffs seek a declaratory judgment that such fines are unlawful and an injunction against the official capacity Defendants nullifying the unlawful fines, and they seek damages under FTCA against the United

States and RFRA against the John or Jane Does in their individual capacities for their roles in imposing religiously burdensome fines.

## JURISDICTION AND VENUE

9.     This Court has subject matter jurisdiction over this action under Article III and the First Amendment of the U.S. Constitution, 28 U.S.C. § 1331, and under 28 U.S.C. § 1346(b) as to the Individual Plaintiffs' claims against the United States under the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 2671, *et seq*. This Court has the authority to grant declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and the Religious Freedom Restoration Act (RFRA), 42 U.S.C. § 2000bb-1(c), and may issue monetary damages pursuant to RFRA, 42 U.S.C. § 2000bb-1(c) and FTCA, 28 U.S.C. § 2674.

10.     On June 23, 2021, Individual Plaintiffs each submitted administrative claims to ICE and DHS, under the FTCA, seeking redress for injuries and damages proximately resulting from the imposition of civil fines. By electronic correspondence dated February 1, 2022, ICE denied Individual Plaintiffs' administrative claims. This second amended complaint is timely filed under FTCA, 28 U.S.C. § 2401(b), as it is being filed within six months from the date of the administrative claim denial.

11.     Venue is proper under 28 U.S.C. § 1391(b)(2),  § 1391(e)(1), and § 1402(b) because a substantial part of the events giving rise to Plaintiffs' claims occurred in this district and Defendants Mayorkas and Johnson reside in this district.

## PARTIES

12.     Plaintiff ASN is a nonprofit coalition of twenty-five faith congregations and social justice organizations, immigrants, and other community members of civil society and organizations based in and around Austin, Texas, that support immigrants fleeing violence or in

danger of deportation as part of their religious practice and in keeping with their religious beliefs. ASN believes that sanctuary is a place where love and protection are living realities. Among other activities, ASN and its members educate the faith community and the community as a whole about the refugee crisis and mass migration, partnering with other educators and multi-faith groups who approach the crisis from ethical and theological perspectives. ASN and its members work closely with the National Sanctuary Collective.

13.     After ICE imposed civil immigration fines on sanctuary leaders, ASN and its members began to work closely with leaders to formulate organizing and legal responses to the fines. This includes responses to the fine levied against Individual Plaintiff Ms. Ramirez, who resides at St. Andrew's Presbyterian Church, a member of ASN. ASN had planned to devote significant time to educating more congregations outside of Austin to join their work but was forced to abandon these plans in order to spend time supporting sanctuary leaders who received fine notices. ASN also suffered financial losses as a result of Defendants' conduct. While ASN is a predominantly volunteer-run organization, the added work of responding to Defendants' targeting of sanctuary leaders required ASN to hire a paid organizer. ASN went from having no paid organizer in 2018 to paying one $6,400 in 2019 and $23,600 in 2020. ASN also incurred additional medical, legal, and simultaneous interpretation costs associated with supporting targeted sanctuary leaders. Their simultaneous interpretation costs went up from approximately $4,680 in 2018 to $7,000 in 2019 and $7,733 in 2020. ASN's address is 14311 Wells Port Dr., Austin, TX, 78728.

14.     Plaintiff First Unitarian is a Unitarian Universalist church based in Salt Lake City. Its mission is to nurture and challenge the spiritual and intellectual journey for all generations and actively engage in building a progressive and just world. Beyond offering sanctuary to Ms.

Chávez, First Unitarian has a long history of participation in the sanctuary movement and immigrant rights movement more broadly. For example, they have furnished apartments for refugees in Salt Lake City for the past 20 years, have offered themselves up as a sanctuary church for 13 years, and have worked in solidarity with other churches and faith-based organizations on immigrant rights issues for 10 years. This work is motivated and informed by First Unitarian's commitment to social justice. Since Ms. Chávez entered sanctuary on January 30, 2018 and received her first fine notice on June 25, 2019, First Unitarian has diverted significant staff and volunteer time and church resources from its traditional activities toward supporting Individual Plaintiff Ms. Chávez in response to ICE's targeting of her. They have organized roughly 200 volunteers, many of whom are worshippers at the church, to support Ms. Chávez, from picking up groceries and providing healthcare to organizing birthday parties and movie nights. A smaller subset of volunteers serves on the Sanctuary Steering Committee, which provides volunteer, security, legal, media, and political coordination. Volunteers provide security for Ms. Chávez twenty-four hours a day, 365 days a year, adding up to over 45,931 hours since January 30, 2018. This estimate does not include volunteer hours for other assistance, services, advocacy, interpretation, and coordination work. Because First Unitarian has prioritized supporting Ms. Chávez, the church has had less resources to support its other social justice efforts. For instance, the church's Social Justice Council and Environmental Ministry have both been less active since the civil fines were issued.

15.     Church staff who in the past have focused on social justice efforts have diverted time and capacity to prioritize meeting sanctuary leaders' essential needs and coordinating meetings for the National Sanctuary Collective. Other members of the congregation have diverted their  time and energy from their historical social justice work  to urgent tasks such as

fundraising for the Chávez family's legal needs, including requests for stays of removal, and planning press events to draw attention to ICE's targeting. The pressing nature of this work has necessarily required that it displace other work that the congregation would have done through its Social Justice Council and Environmental Ministry.

16.     First Unitarian has also diverted funds from budgets to supporting Ms. Chávez in efforts to respond to and challenge the civil fines. After ICE issued Ms. Chávez a notice of intent to fine, the congregation solicited donations from its members to raise $5,000 for legal expenses associated with challenging the notice. They also supported Ms. Chávez by bringing the public's attention to the fines. The congregation has contributed to stories in the local press, has collaborated with local grassroots organizations on press conferences and letter-writing campaigns, and has met with elected officials and other community organizations to seek their support. They also routinely pay for and coordinate interpretation for National Sanctuary Collective meetings.

17.     Plaintiff FMP is a nonprofit organization headquartered in Philadelphia, Pennsylvania. FMP represents immigrant clients—including individuals in sanctuary—in their legal proceedings, provides legal support and training to organizers and advocates, engages in public education and outreach, litigates in the public interest, and advocates for fair and open immigration laws. FMP works with grassroots community groups to elevate individual removal defense cases into public campaigns; educates and informs the public about the widespread benefits of open migration policies; and organizes public forums, workshops, and panel events to provide a platform for scholars, advocates, and activists to challenge status quo ideas about migration.

18.     Starting in 2018, and despite being a small organization with just two full-time staff members, FMP reoriented its work to coordinate the legal efforts in support of sanctuary leaders across the country. As part of this shift in priorities, FMP works closely with the National Sanctuary Collective, a group of sanctuary leaders, their faith communities, advocates and allies. After ICE issued notices of civil immigration fines on sanctuary leaders in 2019, FMP devoted substantial staff time and organizational resources to understanding the administrative process governing civil immigration fines and organized its work to become the lead coordinator of sanctuary leaders' civil fines legal defense before ICE and the Board of Immigration Appeals ("BIA"). FMP is also currently responsible for Ms. Chávez's defense in administrative proceedings. In addition to their legal work, FMP works with sanctuary leaders and other organizations, including ASN and First Unitarian, to publicly advocate against Defendants' targeting of immigrants in sanctuary. ASN, FMP, and First Unitarian have co-drafted and published press releases and responded to media inquiries in support of the sanctuary leaders. FMP and ASN have also coordinated social media outreach and helped coordinate multiple Congressional visits as part of this advocacy. FMP diverted significant time away from its other programs, including altering its prior level of direct client representation, to engage in legal and advocacy work in response to Defendants' conduct. FMP's address is 150 Cecil B. Moore Ave, Suite 203, Philadelphia, PA 19122.

19.     ASN, First Unitarian, and FMP have devoted staff and volunteer time and resources to researching, investigating, and advising sanctuary leaders and their churches about the civil immigration fines process; supporting the sanctuary leaders in addressing their fears and mental anguish at being targeting; coordinating responses to the notices for associated ICE check-

ins; and assisting sanctuary leaders in organizing rallies and events to address the public and press about this issue.

20.     Plaintiff María Chavalán Sut resides in Charlottesville, Virginia. Ms. Chavalán Sut has been in sanctuary since 2018, at the Wesley Memorial United Methodist Church. Ms. Chavalán Sut grew up practicing many religious traditions including Mayan traditions as well as the Roman Catholic Faith. She has a deep faith in God and seeks to live in accordance with her faith, by participating in social justice work and advocating for the sanctuary movement and immigrants' rights. As someone whose family has survived generations of anti-indigenous violence and oppression, Ms. Chavalán Sut views her participation in the sanctuary movement as a search for justice under God's divine mandate. Before the COVID-19 pandemic she attended services at Wesley Memorial United Methodist Church. Currently, Ms. Chavalán Sut is a part of the church's sanctuary ministry. Ms. Chavalán Sut participates in the National Sanctuary Collective to advocate for families, communities, and immigrants nationwide. Her address is 1901 Thomson Rd, Charlottesville, VA 22903.

21.     Plaintiff Vicky Yulissa Chávez-Fino resides in Salt Lake City, Utah. Ms. Chávez entered sanctuary in 2018 at the First Unitarian Church of Salt Lake City, and left three years later on April 12, 2021. Ms. Chávez has been a practicing Evangelical Christian since childhood, as her grandmother taught her, and seeks to live in accordance with her faith, by participating in social justice work and advocating for the sanctuary movement and immigrants' rights. Ms. Chávez has integrated her religious practice into the services and activities of the First Unitarian Church. Ms. Chávez belongs to the church choir and sings at services once a month. She attends the weekly service, unless she is needed to watch the children of other parishioners. Ms. Chávez is both a student and teacher in various groups that convene at the church, including English

classes and classes on knitting and making tamales. In early 2019, the church held a vigil to honor her first year in sanctuary. The group prayed, sang, and lit candles. Ms. Chávez believes it was an act of faith of the First Unitarian Church to offer sanctuary to her, and an act of faith on her part to accept. Ms. Chávez participates in the National Sanctuary Collective to advocate for families, communities, and immigrants nationwide. Her address is 11715 State St. Apt N202, Draper, UT 84020.

22.    Plaintiff Edith Espinal resides in Columbus, Ohio. Ms. Espinal took sanctuary in 2017 at the Columbus Mennonite Church and left four years later on February 18, 2021. Ms. Espinal was raised Catholic, but has been deeply involved in the Mennonite community since taking sanctuary. She attends weekly services, cooks for the congregation on the first Sunday of each month, makes quilts for refugees with other members of the church, and more. Ms. Espinal has learned that fighting for justice, peace, and keeping families safe is at the center of Mennonite teachings. Ms. Espinal shares the Mennonite Church's beliefs that it is critical to provide sanctuary for those who are persecuted. Ms. Espinal's congregation has been active in the sanctuary movement since the 1980s, and its members traveled to the Netherlands in 2019 to pray and participate in a religious service for a family living in sanctuary there to create international solidarity for families like Ms. Espinal's. Ms. Espinal feels a strong connection to the Mennonite faith because, like her own family, Mennonites came to the U.S. many years ago to flee violent persecution. Ms. Espinal participates in the National Sanctuary Collective to advocate for families, communities, and immigrants nationwide. Her address is 4763 Palmetto St., Columbus, OH 43228.

23.    Plaintiff Hilda Veronica Ramirez-Mendez resides in Austin, Texas. Ms. Ramirez has been in sanctuary since 2016, at St. Andrew's Presbyterian Church. Ms. Ramirez is an

Evangelical Baptist but has embraced the Presbyterian faith community since taking sanctuary at St. Andrew's. Ms. Ramirez sees the sanctuary movement as a place of love and peace that is fundamentally grounded in faith. She has found in this faith community a sense of safety, respect, and harmony. She seeks to live in accordance with her faith, by participating in social justice work and advocating for the sanctuary movement and immigrants' rights. Ms. Ramirez participates in the National Sanctuary Collective to advocate for families, communities, and immigrants nationwide. Her address is 14311 Wells Port Dr, Austin, TX 78728.

24.     Defendant Alejandro Mayorkas is the Secretary of DHS. As the Secretary of DHS, he is responsible for the administration and enforcement of the immigration laws of the United States. He is sued in his official capacity for injunctive and declaratory relief. His address is DHS, Office of the General Counsel, 2707 Martin Luther King Jr. Ave. SE, Washington, DC 20528-0485.

25.     Defendant Tae Johnson is the Acting Director of ICE. As the Acting Director of ICE, he is responsible for the administration and enforcement of the immigration laws of the United States. He is sued in his official capacity for injunctive and declaratory relief. His address is ICE, Office of the Principal Legal Advisor, 500 12th St. SW, Mail Stop 5900, Washington, DC 20536-5900.

26.     Defendants Jane or John Does 1-6 are officers employed by Defendant DHS at all times relevant to the incidents complained of in the lawsuit. These Defendants are directly responsible for directing, selecting, and/or enforcing the civil immigration fines provision against Plaintiffs Ms. Chavalán Sut, Ms. Chávez, Ms. Espinal, and Ms. Ramirez. Plaintiffs are unaware of the true names of Defendants Jane or John Does 1-6 and therefore sue these Defendants under such fictitious names. Defendants Jane or John Does 1-6 are sued in their official capacity for

equitable relief and in their individual capacity for damages under RFRA. Plaintiffs will amend their complaint to state those Defendants' full names once they have been ascertained.

27.     Defendants Jane or John Does 7-12 are officers employed by Defendant ICE at all times relevant to the incidents complained of in the lawsuit. These Defendants are directly responsible for directing, selecting, and/or enforcing the civil immigration fines provision against Individual Plaintiffs Ms. Chavalán Sut, Ms. Chávez, Ms. Espinal, and Ms. Ramirez. Plaintiffs are unaware of the true names of Defendants John or Jane Does 7-12 and therefore sue these Defendants under such fictitious names. Defendants Jane or John Does 7-12 are sued in their official capacity for equitable relief and in their individual capacity for damages under RFRA. Plaintiffs will amend their complaint to state those Defendants' full names once they have been ascertained.

28.     Defendant DHS is an agency that supervises and directs subcomponents to enforce immigration and customs law, including civil immigration fines enforcement, and is responsible for the detention and deportation of immigrants. It has offices in all 50 states. It is headquartered at Office of the General Counsel, 2707 Martin Luther King Jr. Ave. SE, Washington, DC 20528-0485.

29.     Defendant ICE is a component of the Department of Homeland Security that enforces immigration and customs law, including civil immigration fines enforcement, and is responsible for the detention and removal of immigrants. It has offices in all 50 states. It is headquartered at Office of the Principal Legal Advisor, 500 12th St. SW, Mail Stop 5900, Washington, DC 20536-5900.

30.     Defendant United States of America is sued for Individual Plaintiffs' injuries caused by wrongful acts of its employees. Those employees were acting within the scope of their

employment under circumstances in which the United States, if a private person, would be liable to Individual Plaintiffs according to the laws of the District of Columbia and the states in which they individually reside.

## STATEMENT OF FACTS

31.     All statements herein are made upon information and belief except where basis of knowledge is specified.

### The Sanctuary Movement Is Rooted in Religiously-Based
### Resistance to Government Retaliation.

32.     During the early 1980s, hundreds of thousands of Central Americans arrived in the U.S. seeking asylum from brutal civil wars, severe political repression, and mass killings and other forms of extreme violence. Despite the enactment of the 1980 Refugee Act, which provided for humanitarian protection to individuals fleeing these types of conditions, ICE's predecessor, the Department of Justice Immigration and Naturalization Service (INS), specifically targeted Central American refugees for deportation. Viewing these actions as immoral, racist, and motivated by the U.S.' backing of military regimes in Central America, communities across the country responded in what would become a religious movement.[9]

33.     Calling themselves "sanctuaries," communities and houses of worship began building networks of support to assist the growing number of refugees. They opened their doors to provide physical shelter, as well as food, medical care, employment, and legal representation within their sacred spaces. They spoke out about the immorality of U.S. immigration policy and

---

[9] *See, e.g.,* Gary MacEoin, *A Brief History of the Sanctuary Movement, in* SANCTUARY: A RESOURCE GUIDE FOR UNDERSTANDING AND PARTICIPATING IN THE CENTRAL AMERICAN REFUGEES' STRUGGLE 14 (G. MacEoin ed., 1985).

partnered with families to highlight the hardship each had faced. By 1985, the sanctuary movement had grown to over 500 member-sites across the United States.[10]

34.      By the mid-1980s, the INS retaliated against sanctuary movement members in full force, hoping to "disband" what they viewed as a modern "underground railroad" by sending paid informants to infiltrate, record, and monitor them under "Operation Sojourner."[11] These undercover agents, posing as congregants and clergy, attended and taped worship services and other church gatherings and documented license plate numbers, which culminated in a series of high-profile show trials in Texas and Arizona, also known as the "Sanctuary Trials."[12] Legal scholars at the time criticized this disturbing phenomenon as part and parcel of a "spotty American tradition of subjecting supposedly treasonous political and social movements to ordeals of harassment and prosecution."[13] While these prosecutions resulted in the felony convictions of eight sanctuary leaders, none of the eight ended up serving time in jail.[14]

35.      The 1980s sanctuary movement galvanized public outrage over the government's wrongful retaliation against asylum seekers of faith, giving rise to landmark legislation and court decisions. In 1990, Congress passed legislation allowing for Temporary Protected Status to immigrants from certain countries.[15] The following year, the settlement agreement in *American*

---

[10] Puck Lo, *Inside the New Sanctuary Movement That's Protecting Immigrants From ICE,* THE NATION, May 6, 2015, https://www.thenation.com/article/archive/inside-new-sanctuary-movement-thats-protecting-immigrants-ice/.

[11] Kristina M. Cambell, *Operation Sojourner: The Government Infiltration of the Sanctuary Movement in the 1980's and its Legacy on the Modern Central American Refugee Crisis*, 13(3) UNIV. OF ST. THOMAS L. J. 474, 480 (2017).

[12] *Id.* at 480-482.

[13] *Id.* at 384; *see also* Peter Applebome, *Sanctuary Movement: New Hopes After Trial*, N.Y. TIMES, May 6, 1986, https://www.nytimes.com/1986/05/06/us/sanctuary-movement-new-hopes-after-trial.html.

[14] Barbara Bezdek, *Religious Outlaws: Narratives of Legality and the Politics of Citizen Interpretation*, 62 TENN. L. REV. 899, 906 n.21 (1994-1995).

[15] Immigration Act of 1990, Pub. L. 101–649, 104 Stat. 4978 (1990).

*Baptist Churches v. Thornburgh* resulted in stays of removal and new asylum procedures that allowed many Salvadorans and Guatemalans to remain in the U.S.[16] In 1997, Congress passed The Nicaraguan Adjustment and Central American Relief Act, which allowed for suspension or cancellation of removal for many asylum seekers from Central America and former Soviet bloc countries.[17]

36.    The sanctuary movement reignited in the 2000s through a network of over 800 Christian, Jewish, Muslim, Hindu, Sikh, Baha'i, and Buddhist houses of worship that opened their doors to immigrants at risk of deportation, amidst a steady rise in anti-immigrant rhetoric and the criminalization, detention, and deportation of immigrants.[18] Much like their 1980s predecessors, these faith communities pledged to protect and stand with immigrants by providing legal, emotional, and practical support, including in some cases physical shelter, so that they may continue to fight for their right to live and remain in the U.S., as a testament of faith in action.[19] Their advocacy and actions have spurred legislative changes at the local and state levels, as localities have adopted "sanctuary" measures to welcome and protect immigrant residents.[20]

---

[16] *American Baptist Churches v. Thornburgh* 760 F. Supp. 796 (N.D. Cal. 1991).

[17] Nicaraguan Adjustment and Central American Relief Act of 1997 (NACARA), Pub. L. No. 105-100, 111 Stat. 2193 (1997).

[18] In 2005, the U.S. House of Representatives passed an anti-immigrant bill that would dramatically increase the criminalization of undocumented immigrants. *See,* Border Protection, Antiterrorism, and Illegal Immigration Control Act of 2005, H.R. 4437, 109 CONG. (2005). "This bill and rampant anti-immigrant sentiment clashed with the values and beliefs of members of many religious communities across the country, sparking the New Sanctuary Movement." *Fighting Injustice: The New Sanctuary Movement*, LATIN AMERICA WORKING GROUP, https://www.lawg.org/fighting-injustice-the-new-sanctuary-movement/.

[19] Sharon Otterman, *Hindu Temple in Queens Joins Sanctuary Movement*, N. Y. TIMES, May 7, 2017, https://www.nytimes.com/2017/05/07/nyregion/a-lonely-stand-hindu-temple-in-queens-joins-sanctuary-movement.html.

[20] *See, e.g.*, Christopher N. Lasch et al., *Understanding "Sanctuary Cities*," 59 B.C.L. REV. 1703 (2018).

**Taking Sanctuary and Participating in the Sanctuary Movement are Religious Acts**

37.     Austin Sanctuary Network is a faith-based coalition that supports immigrants and participates in the broader, religiously grounded sanctuary movement. It views both taking and offering sanctuary as acts of faith, rooted in the religious duty to welcome the stranger. Its members include several congregations across eight religious denominations, including St. Andrew's Presbyterian Church where Ms. Ramirez resides.

38.     First Unitarian is a Salt Lake City-based church committed to human rights and social justice where Ms. Chávez was living in sanctuary. First Unitarian sees support for immigrants as a religious mandate outlined in Leviticus 19 ("You shall not do harm to sojourners in your land. He shall be as native among you, and you shall love him as yourself.") and Hebrews 13 ("Do not neglect to give hospitality to strangers."). For First Unitarian, these passages also mandate that the church offer sanctuary to those seeking refuge.

39.     Individual Plaintiffs' religious beliefs are deeply intertwined with the sanctuary movement. For them, taking sanctuary and participating in the sanctuary movement are religious acts.

40.     Ms. Chavalán Sut believes that her participation in the sanctuary movement is a core part of her search for justice. She believes that taking sanctuary and advocating for herself and others in sanctuary is part of God's divine mandate. As an indigenous Maya woman, Ms. Chavalán Sut's deep faith has sustained her through her decision to take sanctuary and to continue to speak out for the rights of sanctuary leaders, immigrants, indigenous people, and women. As described above, Ms. Chavalán Sut is an active member of the Wesley Memorial United

20

Methodist Church where she lives in sanctuary, attending services until the COVID-19 pandemic and taking part in the church's sanctuary ministry.

41.    Ms. Chávez believes that as a person of faith, she must participate in the sanctuary movement and speak out on behalf of herself, her young children, and immigrants more broadly. She believes that no mother should have to make the impossible decision to leave her children behind or take them into harm's way. She knows ICE's policies that separate families and send children into dangerous situations affect not just her, but thousands of other families in the U.S. Ms. Chávez believes it was an act of faith of the First Unitarian Church to offer sanctuary to her, and an act of faith on her part to accept.

42.    Ms. Espinal believes that, that no matter how difficult life can be, fighting for justice, peace, and what is right is at the center of Mennonite teachings. The Mennonite Church's less hierarchical structure appeals to Ms. Espinal because it makes it easier for the church's members to stand in solidarity with the most vulnerable and to fight for justice. Ms. Espinal also shares the Mennonite Church's beliefs that keeping the family safe is the most important thing in the world and that it is critical to provide sanctuary for those who are persecuted. Ms. Espinal's congregation has been active in the sanctuary movement since the 1980s, and its members traveled to the Netherlands in 2019 to pray and participate in a religious service for a family living in sanctuary there to create international solidarity for families like Ms. Espinal's. Ms. Espinal feels a strong connection to the Mennonite faith because, like her own family, Mennonites came to the U.S. many years ago to flee violent persecution.

43.    Ms. Ramirez sees the sanctuary movement as a place of love and peace that is fundamentally grounded in faith. She has found in this religious community a sense of safety, respect, and harmony. Ms. Ramirez seeks to live in accordance with her faith, by participating in

social justice work and advocating for the sanctuary movement and immigrants' rights. Ms. Ramirez's participation in the sanctuary movement flows from this faith, since her religious beliefs center the importance of family unity, justice, protecting those in need, and standing up for what is right.

### The Trump Administration Has Targeted the Modern Sanctuary Movement and Nonwhite Immigrants for Retaliation and Punishment.

44.     The Trump Administration used its authority to target sanctuary efforts, as part of President Trump's broader campaign to limit immigration. Federal immigration officials have targeted sanctuary movement leaders, members, and clergy, along with other immigrant rights advocates, for deportation and surveillance, both within the U.S. and at the border.[21] Both in and out of office, Donald J. Trump has often spoken disparagingly of today's sanctuary movement[22] portraying advocates, particularly noncitizens, who call for sanctuary as his administration's 'political enemies.'[23] Despite a standing 2011 memorandum issued by the Obama

---

[21] *See, e.g.,* Adolfo Flores, *A Pastor Who Was Put On A Watch List After Working With Immigrants Is Suing The US*, BUZZFEED, July 8, 2019, https://www.buzzfeednews.com/article/adolfoflores/pastor-watchlist-immigrants-lawsuit; Nick Pinto, *No Sanctuary*, THE INTERCEPT, Jan. 19, 2018, https://theintercept.com/2018/01/19/ice-new-sanctuary-movement-ravi-ragbir-deportation/; Maria Sacchetti and Davie Weigel, *ICE has detained or deported prominent immigration activists*, WASH. POST, JAN. 19, 2018, https://www.washingtonpost.com/powerpost/ice-has-detained-or-deported-foreigners-who-are-also-immigration-activists/2018/01/19/377af23a-fc95-11e7-a46b-a3614530bd87_story.html; Gaby Del Valle, *ICE Keeps Arresting Prominent Immigration Activists. They Think They're Being Targeted.*, VICE, Aug. 24, 2019, https://www.vice.com/en_us/article/ywady5/ice-keeps-arresting-prominent-immigration-activists-they-think-theyre-being-targeted; Jimmy Tobias, *Exclusive: ICE Has Kept Tabs on 'Anti-Trump ' Protesters in New York City*, THE NATION, Mar. 6, 2019, https://www.thenation.com/article/ice-immigration-protest-spreadsheet-tracking/.

[22] *See, e.g.,* The Associated Press, *Trump Administration Gets Court Victory in Sanctuary Cities Case*, N.Y. TIMES, July 12, 2019, https://www.nytimes.com/2019/07/12/us/sanctuary-cities-ruling.html; Erik Slobe, *DOJ blocked from restricting federal grants to 'sanctuary cities'*, JURIST, Oct. 8, 2018, https://www.jurist.org/news/2018/10/doj-blocked-from-restricting-federal-grants-to-sanctuary-cities/; Mike Pearl, *What Are 'Sanctuary Cities ' and Why Does Trump Hate Them So Much?*, VICE, Sept. 2, 2016, https://www.vice.com/en_us/article/yvevqy/sanctuary-cities-donald-trump-immigration-plan.

[23] *See, e.g.,* Noah Bierman, *Trump kicks off a new campaign reprising his old themes,* L.A. TIMES, June 18, 2019, https://www.latimes.com/politics/la-na-pol-trump-reelection-kickoff-rally-arena-immigration-orlando-20190618-

Administration's Director of ICE instructing agents not to pursue enforcement actions at "sensitive locations" such as churches, schools, and courthouses, recent reports have documented numerous incidents of Trump Administration ICE officials entering such locations, including churches that are providing sanctuary to noncitizens.[24]

45.     The targeting of sanctuary leaders was a critical piece of President Trump's immigration agenda since he took office in 2017. That year, as one of his first official actions as President, Trump signed Executive Order No. 13768. This Executive Order explicitly targeted sanctuary cities and spaces, claiming that "sanctuary jurisdictions across the United States… in an attempt to shield aliens from removal from the United States…have caused immeasurable harm to the American people and to the very fabric of our Republic."[25] The Executive Order called on the Secretary of Homeland Security to "ensure the assessment and collection of all fines and penalties…from aliens unlawfully present in the United States and from those who facilitate their presence in the United States."[26]

46.     The punitive fines policy against sanctuary leaders was also part of a widespread and systematic attack by the Trump Administration on nonwhite immigrants, which included but

---

story.html; Philip Rucker, '*How do you stop these people?': Trump's anti-immigrant rhetoric looms over El Paso massacre,* WASH. POST, August 4, 2019, https://www.washingtonpost.com/politics/how-do-you-stop-these-people-trumps-anti-immigrant-rhetoric-looms-over-el-paso-massacre/2019/08/04/62d0435a-b6ce-11e9-a091-6a96e67d9cce_story.html.

[24] U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, ENFORCEMENT ACTIONS AT OR FOCUSED ON SENSITIVE LOCATIONS 10029.2, Memorandum (Oct. 24, 2011); Liz Robbins, *In a 'Sanctuary city, ' Immigrants are Still at Risk,* N.Y. TIMES, Feb. 27, 2018, https://www.nytimes.com/2018/02/27/nyregion/sanctuary-cities-immigrants-ice.html.

[25] Executive Order No. 13768, 82 Fed. Reg. 8799 (Jan. 25, 2017).

[26] *Id.*

was not limited to the cancellation of  DACA[27], the grotesque family separation policy,[28] attempts

to end asylum on the Southern Border[29], the Muslim Ban[30], the Africa Ban[31], cancellation of TPS

status[32], and transformation of public charge regulations.[33]

---

[27] *See, e.g.,* Vanessa Romo, Martina Stewart, and Brian Naylor, *Trump Ends DACA, Calls On Congress To Act*, NPR, Sept. 5, 2017, https://www.npr.org/2017/09/05/546423550/trump-signals-end-to-daca-calls-on-congress-to-act; Colby Itkowitz and Robert Barnes, *Trump intends to renew effort to end DACA protections for young undocumented immigrants*, WASHINGTON POST, June 19, 2020, https://www.washingtonpost.com/politics/trump-intends-to-renew-effort-to-end-daca-protections/2020/06/19/04aea99c-b236-11ea-8f56-63f38c990077_story.html.

[28] *See, e.g.*, Staff of H. Comm. on the Judiciary, 116th Cong., THE TRUMP ADMINISTRATION FAMILY SEPARATION POLICY: TRAUMA, DESTRUCTION AND CHAOS, MAJORITY STAFF REPORT, (2020), https://judiciary.house.gov/uploadedfiles/the_trump_administration_family_separation_policy_trauma_destruction_and_chaos.pdf?utm_campaign=4526-519; Michael D. Shear, *Trump and Aides Drove Family Separation at Border, Documents Say*, N.Y. TIMES, Jan. 14, 2021, https://www.nytimes.com/2021/01/14/us/politics/trump-family-separation.html; Amanda Holpuch and Stephanie Kirchgaessner, *Trump official admits family separation policy 'should never have been implemented'*, THE GUARDIAN, Jan. 14, 2021, https://www.theguardian.com/us-news/2021/jan/14/trump-official-admits-family-separation-policy-rod-rosenstein.

[29] *See, e.g.,* Priscilla Alvarez and Geneva Sands, *Trump to block migrants and asylum seekers at US-Mexico border*, CNN, Mar. 18, 2020, https://www.cnn.com/2020/03/18/politics/trump-migrants-banned/index.html; Tal Axelrod, *Trump administration implements new restrictions on asylum eligibility*, THE HILL, Dec. 10, 2020, https://thehill.com/homenews/administration/529743-trump-administration-implements-new-restrictions-on-asylum; and Camilo Montoya-Galvez, *Trump rushes to enact asylum restrictions ahead of Biden presidency*, CBS NEWS, Jan. 11, 2021, https://www.cbsnews.com/news/trump-asylum-restrictions-biden-presidency/.

[30] *See, e.g.,* Michael D. Shear, Nicholas Kulish and Alan Feuer, *Judge Blocks Trump Order on Refugees Amid Chaos and Outcry Worldwide*, N.Y. TIMES, Jan. 28, 2017, https://www.nytimes.com/2017/01/28/us/refugees-detained-at-us-airports-prompting-legal-challenges-to-trumps-immigration-order.html; Michael D. Shear and Ron Nixon, *How Trump's Rush to Enact an Immigration Ban Unleashed Global Chaos*, N.Y. TIMES, Jan. 29, 2017, https://www.nytimes.com/2017/01/29/us/politics/donald-trump-rush-immigration-order-chaos.html; Jenna Johnson and Abigail Hauslohner, *'I think Islam hates us': A timeline of Trump's comments about Islam and Muslims*, WASHINGTON POST, May 20, 2017, https://www.washingtonpost.com/news/post-politics/wp/2017/05/20/i-think-islam-hates-us-a-timeline-of-trumps-comments-about-islam-and-muslims/; and Michael D. Shear, *New Order Indefinitely Bars Almost All Travel From Seven Countries*, N.Y. TIMES, Sept. 24, 2017, https://www.nytimes.com/2017/09/24/us/politics/new-order-bars-almost-all-travel-from-seven-countries.html.

[31] *See, e.g.,* Kovie Biakolo, *How the 'African Ban ' Ripped a Family Apart*, THE ATLANTIC, Oct. 27, 2020, https://www.theatlantic.com/politics/archive/2020/10/how-trumps-african-ban-ripped-families-apart/616831/; Liam Knox, *Civil rights groups condemn Trump's travel-ban expansion to six African countries*, Feb. 27, 2020, NBC News, https://www.nbcnews.com/news/nbcblk/civil-rights-groups-condemn-trump-s-travel-ban-expansion-six-n1142231; and Sarah Al-Arshani, *Trump's expanded travel ban will hit nearly a fifth of Africa's population, a continent that he once said is home to 's---hole ' countries*, BUSINESS INSIDER, Feb. 1, 2020, https://www.businessinsider.com/trump-expands-ban-to-more-countries-including-nigeria-2020-1.

[32] *See, e.g.,* Miriam Jordan, *Trump Administration Says That Nearly 200,000 Salvadorans Must Leave*, N.Y. TIMES, Jan. 8, 2018, https://www.nytimes.com/2018/01/08/us/salvadorans-tps-end.html; Jonathan Blitzer, *The Battle Inside the Trump Administration Over T.P.S.*, THE NEW YORKER, May 12, 2018, https://www.newyorker.com/news/daily-comment/the-battle-inside-the-trump-administration-over-tps.

47.     Sanctuary leaders, including all four Individual Plaintiffs, are predominantly women, a manifestation of the Trump Administration's intent to exact maximum cruelty to vulnerable women and families seeking protection from the United States.

**Defendants Have Targeted Sanctuary Leaders Through Unprecedented and Retaliatory Civil Immigration Fines**

48.     Starting in approximately December 2017, Trump Administration officials embarked on a course of action to issue fines for immigration violations and, over time, became almost exclusively – and obsessively – focused on sanctuary leaders because they were premising their objection to removal on high-minded religious principles and because of their organizing, associations and advocacy against the fines which Trump Administration officials derisively referred to as "conniving" and which specifically drew the retaliatory ire of Trump Administration officials.

49.     In December 2017, ICE Chief of Staff and Senior Advisor Jon Feere emailed DHS Assistant General Counsel Michael Davidson and ICE leadership asking for help "fast tracking" the civil fines directive, and reported his progress to Trump Administration Senior Advisor Stephen Miller. In March 2018, Miller reached out to Gene Hamilton, an attorney with the Office of the Attorney General, to ask about the government's statutory authority to issue fines. Mr. Hamilton cited INA § 274C and § 274D, along with statutory language detailing how money obtained from civil fines could be used for enforcement activities. Mr. Miller replied, "So the

---

[33] *See, e.g.,* Michael D. Shear and Emily Baumgaertner, *Trump Administration Aims to Sharply Restrict New Green Cards for Those on Public Aid*, N.Y. TIMES, Sept. 22, 2018,
https://www.nytimes.com/2018/09/22/us/politics/immigrants-green-card-public-aid.html; Torrie Hester, Mary E. Mendoza, Deirdre Moloney and Mae Ngai, *Now the Trump administration is trying to punish legal immigrants for being poor*, WASHINGTON POST, Aug. 9, 2018, https://www.washingtonpost.com/news/made-by-history/wp/2018/08/09/now-the-trump-administration-is-trying-to-punish-legal-immigrants-for-being-poor/.

fines and penalties can PAY for wall construction?" and later described the strategy as "remarkable."[34]

50.     On June 19, 2018, the Trump Administration's first Acting ICE Director, Thomas Homan, issued a directive setting forth the agency's policy regarding the assessment and collection of civil fines. It listed the procedures and requirements for the fine issuance process. On the same day, Acting ICE Director Homan issued a delegation order granting field offices and local-level ICE officers authority to decide whom to fine under the guidance.[35]  The focus of the fines came to be those seeking and supporting sanctuary from Trump Administration immigration policies.

51.     In April 2019, agency officials emailed ICE Field Offices a spreadsheet *only* of containing the names *only* of people who had taken sanctuary in churches within their area of responsibility and instructed each office to complete a questionnaire about the fine eligibility of each person in sanctuary.

52.     In or around June 2019, ICE issued a set of civil immigration fines against nine immigrants in sanctuary: the four individual plaintiffs in the instant suit, and five others.  Eight of the 9 are women.  Plaintiffs Ms. Chavalán Sut, Ms. Chávez, Ms. Espinal, and Ms. Ramirez were among those who received letters specifying ICE's intent to fine them via form I-79B "Notice of Intention to Fine Under Section 274D of the Immigration and Nationality Act." Upon

---

[34] AMERICAN OVERSIGHT, *In the Documents: Stephen Miller Emails With Justice Department Official About Anti-Immigration Measures*, (Jul. 23, 2020), https://www.americanoversight.org/in-the-documents-stephen-miller-emails-with-justice-department-official-about-anti-immigration-measures; *see* Plaintiff's Compl., No. 1:19-cv-00774 (D.D.C. Mar. 20, 2019), https://www.americanoversight.org/document/american-oversight-v-dhs-doj-hhs-and-state-stephen-miller-communications.

[35] U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, Delegation Order, DO-01-2018, 306-112-002a, Department of Homeland Security, June 19, 2018, https://ccrjustice.org/sites/default/files/attach/2020/10/Sanctuary%20FOIA%20Doc%201%20-%20Homan%20Delegation%20Order-ICE-Civil-Fines.pdf.

information and belief, at least one individual of the other four individuals who received a letter during this period "self-departed." Another individual won her case. The third individual received a voluntary departure fine. The fourth individual is still fighting the fines from sanctuary. The outcome of the fifth case is unknown.

53.     The fines against Plaintiffs Ms. Chavalán Sut, Ms. Chávez, Ms. Espinal, and Ms. Ramirez ranged from 200,000 to over 500,000 dollars, making national headlines due to the unprecedented nature of the fines and exorbitant amounts. Ms. Chavalán Sut's initial fine was for $214,132; Ms. Espinal's initial fine was for $497,777; Ms. Chávez's initial fine was for $453,832; and Ms. Ramirez's initial fine was for $303,620. These forms alleged that recipients had "willfully failed or refused to depart the United States," "willfully failed or refused to present [themselves] for removal," and "connived, conspired, or took any other action" to thwart their deportations.[36]

54.     On June 27, 2019, an agency official sent out an email to redacted recipients announcing ICE's issuance of fines to people in sanctuary. The email instructed recipients to expect media interest in the fines "because each of these cases has already had high media interest and because 8 of the 9 appear to have lawyers."[37] The email included a table tracking nine people in sanctuary.

55.     Immigration lawyers and even former federal immigration officials have stated that these fines are completely unprecedented. Leon Fresco, the former deputy assistant attorney general for the DOJ Office of Immigration Litigation, commented that the fines are "a vivid

---

[36] Ordoñez, *supra* note 6.

[37] This email was produced by ICE as part of the FOIA suit *Austin Sanctuary Network, et al. v. ICE*, ¶ 41, *infra.* U.S. IMMIGRATION AND CUSTOM ENFORCEMENT, "Sanctuary Cases – Civil Fines," Email dated June 27, 2019, https://ccrjustice.org/sites/default/files/attach/2020/10/Sanctuary FOIA Doc 4 - Email_ICE Issues Fines.pdf.

illustration of the lengths the Trump administration will go to use any available authority to try to enforce immigration law…I have not seen a $300,000 fine for failing to facilitate one's own removal."[38]

56. As news of the fines spread, it became clear that ICE had issued the most significant fines against a select group of people: prominent, devout, and outspoken leaders of the faith-based sanctuary movement across the United States.[39] Each sanctuary leader involved as a Plaintiff in the instant suit has publicly advocated for immigrant rights in connection with her faith, as a manifestation of their Christian duty to welcome the stranger (Matthew 25:35 "I was a stranger and you welcomed me.").

---

[38] Ordoñez, *supra* note 6.

[39] *See, e.g.,* Danae King, *Julian Castro visits immigrant Edith Espinal in sanctuary*, THE COLUMBUS DISPATCH, Oct. 15, 2019, https://www.dispatch.com/news/20191015/julian-castro-visits-immigrant-edith-espinal-in-sanctuary; Haley Nelson, *Supporters hold Mother's Day concert for Edith Espinal*, ABC 6, May 10, 2019, https://abc6onyourside.com/news/local/supporters-hold-mothers-day-concert-for-edith-espinal; Joel Dyer, *Windows, Walls and Invisible Lines: Portraits of Life in Sanctuary*, BOULDER WEEKLY, July 11, 2019, https://www.boulderweekly.com/news/windows-walls-and-invisible-lines-2/; Regina Garcia Cano, The Associated Press, *Churches offer haven from deportation*, ARKANSAS DEMOCRAT GAZETTE, Aug. 3, 2019, https://www.arkansasonline.com/news/2019/aug/03/churches-offer-haven-deportation/?features-religion; Danae King, *Second Columbus woman facing deportation seeks sanctuary at church*, THE COLUMBUS DISPATCH, July 1, 2018, https://www.dispatch.com/news/20180701/second-columbus-woman-facing-deportation-seeks-sanctuary-at-church; Mary Tuma, *Amid New Immigration Policies Local Attorneys and Immigrants Navigate a Broken System*, THE AUSTIN CHRONICLE, July 26, 2019, https://www.austinchronicle.com/news/2019-07-26/amid-new-immigration-policies-local-attorneys-and-immigrants-navigate-a-broken-system/; Courtney Tanner, *How a mother and her two girls are celebrating Christmas inside a Utah church while avoiding deportation*, THE SALT LAKE CITY TRIBUNE, Dec. 23, 2018, https://www.sltrib.com/news/2018/12/23/christmas-sanctuary-how/; Leoneda Inge, *Honduran Woman Seeks Sanctuary In Chapel Hill Church*, NORTH CAROLINA PUBLIC RADIO – WUNC, Apr. 18, 2018, https://www.wunc.org/post/honduran-woman-seeks-sanctuary-chapel-hill-church; Dave Eggers, *The Trump Administration Seeks to Deport An Abuse Victim Who Fears For Her Life*, THE NEW YORKER, Oct. 24, 2018, https://www.newyorker.com/news/daily-comment/the-trump-administration-seeks-to-deport-an-abuse-victim-who-fears-for-her-life; Ned Oliver, *ICE ordered her deportation. Instead she's spent the last year living in a Richmond church. 'I will not dare to put a foot outside'*, VIRGINIA MERCURY, July 21, 2019, https://www.virginiamercury.com/2019/07/21/ice-ordered-her-deportation-instead-shes-spent-the-last-year-living-in-a-richmond-church-i-will-not-dare-to-put-a-foot-outside/; Abigail Clukey, *Undocumented Woman Finds Healing And Support In Sanctuary*, NATIONAL PUBLIC RADIO, Aug. 4, 2019, https://www.npr.org/2019/08/04/745609635/undocumented-woman-finds-healing-and-support-in-sanctuary.

57.     Ms. Chavalán Sut has given interviews describing ICE's fines as "extortion,"[40] and members of her community say that being involved in her "fight for freedom" has "opened [their] eyes to the callous way the U.S. government treats the most vulnerable people on earth."[41] As someone whose family has survived generations of anti-indigenous violence and oppression, Ms. Chavalán Sut views her participation in the sanctuary movement as a search for justice under God's divine mandate.

58.     Ms. Chávez's experience in sanctuary is the subject of a short documentary film,[42] and she has vowed to keep fighting her case and encouraged others who have fled domestic violence to do the same.[43] Ms. Chávez believes she has a religious duty to speak out publicly about the injustice she is facing due to ICE's retaliatory civil fines. She believes that as a person of faith, she must participate in the sanctuary movement and speak out on behalf of herself, her young children, and immigrants more broadly. She believes that no mother should have to make the impossible decision to leave her children behind or take them into harm's way. She knows ICE's policies that separate families and send children into dangerous situations affect not just her, but thousands of other families in the U.S. Ms. Chávez believes it was an act of faith of the First Unitarian Church to offer sanctuary to her, and an act of faith on her part to accept.

---

[40] James Goodman, *The Sanctuary Strategy*, THE PROGRESSIVE, Dec. 1, 2019, https://progressive.org/magazine/the-sanctuary-strategy-goodman/.

[41] Carol Kuruvilla, *ICE Threatens Guatemalan Woman Who Sought Sanctuary In Church With $214,000 Fine*, HUFFPOST, July 9, 2019, https://www.huffpost.com/entry/ice-guatemalan-woman-sanctuary-church-fine_n_5d24aebde4b07e698c415aa1.

[42] RadioWest, *Sanctuary*, YOUTUBE (Mar. 21, 2018), https://www.youtube.com/watch?v=q1lo8gsOOCA&ab_channel=RadioWest.

[43] Ashley Imlay, *After Appeal Denied, Mother of 2 Living in SL Church Vows to Continue Fight for Asylum*, KSL, July 9, 2018, https://www.ksl.com/article/46357337/after-appeal-denied-mother-of-2-living-in-sl-church-vows-to-continue-fight-for-asylum.

59.     Ms. Espinal met with many community leaders and elected officials to discuss immigration policy from sanctuary.[44] While in sanctuary, she was interviewed by countless Spanish and English media outlets, and she and her attorney were the subject of a documentary film.[45] Until February 18, 2021, when she was granted an order of supervision by ICE, Ms. Espinal was one of three women living in sanctuary in Columbus, but she was the only one willing to speak to the media. Ms. Espinal often invited journalists to her church because she wants the public to know how she lives and the conditions in which she has survived. Her ultimate goal is freedom and safety – not just for herself and her family, but for all immigrants.

60.     Ms. Ramirez is an Evangelical Baptist who has embraced the Presbyterian faith in sanctuary, and whose belief in the sanctity of all life has led her to speak out against the violence of deportation and U.S. immigration policies. Ms. Ramirez has for years been described as a "poster child for the [sanctuary] movement."[46] The targeted sanctuary leaders all have engaged in significant organizing, including vigils, rallies, and Congressional visits—all motivated by their deeply held religious beliefs—to raise awareness of their dire circumstances and the cruelty of deportation policies. Many of the targeted sanctuary leaders participate in the National Sanctuary Collective, supported by organizations like Organizational Plaintiffs ASN, First Unitarian, and FMP, to respond to developments in immigration policy and to advocate for fair and just responses all of which has a religiously grounded approach.

---

[44] Gabe Ortiz, *Julián Castro visits Ohio mom who has been in sanctuary for two years after facing deportation,* DAILY KOS, Oct. 15, 2019, https://www.dailykos.com/stories/2019/10/15/1892581/-Juli-n-Castro-visits-Ohio-mom-who-has-been-in-sanctuary-for-two-years-after-facing-deportation.

[45] "The Undocumented Lawyer", OPTIMIST, https://optimist.co/films/the-undocumented-lawyer/ (last visited Jan. 17, 2020).

[46] Abigail Hauslohner, *The 'sanctuary city 'on the front line of the fight over Trump's immigration policy,* WASH. POST, Feb. 2, 2017, https://www.washingtonpost.com/national/we-cannot-afford-to-make-our-community-less-safe-by-driving-people-into-the-shadows/2017/02/02/f14ed2d6-e5ac-11e6-ba11-63c4b4fb5a63_story.html.

61.     The civil immigration fine letters have required additional resources to be marshaled in defense of these sanctuary leaders, including the coordination of legal responses and advocacy coordinated by groups like Organizational Plaintiffs ASN, First Unitarian, and FMP, which helped sanctuary leaders prepare legal briefing, press statements, events, and other advocacy to address the fines. As a result of these coordinated efforts, the vast majority of the sanctuary leaders who received fines filed answers to their respective intent-to-fine letters in August and September 2019, contesting the fines and arguing they are unconstitutional on their face and as-applied.

62.     In or around October 2019, eight fine recipients received near-identical letters from DHS stating that their fines had been withdrawn due to ICE discretion. The seemingly coordinated withdrawal of these fines, like the original intent-to-fine letters, received local, national, and international media attention.[47] At the time, ICE spokespersons publicly stated that they will continue to pursue any and all methods of deportation, including re-imposition of the fines, and that "ICE remains committed to utilizing this [civil fines] enforcement tool."[48]

---

[47] *See, e.g., EEUU cancela multa de casi medio millón de dólares a una immigrante Mexicana*, EL PERIODICO, Oct. 23, 2019, https://www.elperiodico.com/es/internacional/20191023/eeuu-cancela-multa-inmigrante-mexicana-7696965; Ivette Leyva, *Ice retira las multas de hasta 500,000 dólares impuestas a migrantes refugiados en iglesias*, TELEMUNDO, Oct. 23, 2019, https://www.telemundo.com/noticias/2019/10/23/ice-retira-las-multas-de-hasta-500000-dolares-impuestas-migrantes-refugiados-en-iglesias-tmna3558346; Franco Ordoñez, *Trump Administration Withdraws Huge Fines For Some Immigrants In U.S. Illegally*, NATIONAL PUBLIC RADIO, Oct. 22, 2019, https://www.npr.org/2019/10/22/772263253/trump-administration-withdraws-huge-fines-for-some-immigrants-in-u-s-illegally; Geneva Sands, *ICE rescinds half-million fine against undocumented immigrant living in Ohio church,* CNN, Oct. 22, 2019, https://www.cnn.com/2019/10/22/politics/ice-rescinds-fine-edith-espinal/index.html; Julián Aguilar, *Immigration agency decides against six-figure fines for undocumented immigrants living in sanctuaries*, THE TEXAS TRIBUNE, Oct. 23, 2019, https://www.texastribune.org/2019/10/23/trump-administration-cancels-big-fines-some-undocumented-immigrants/; The Associated Press, *ICE withdraws big fines for immigrants living in churches*, TAMPA BAY TIMES, Oct. 24, 2019, https://www.tampabay.com/news/2019/10/24/ice-withdraws-big-fines-for-immigrants-living-in-churches/.

[48] *Id*.

63.     In December 2019, before even informing the recipients, ICE gave an exclusive to *The Washington Times*, announcing that it would be issuing new letters to the sanctuary leaders whose fines had been rescinded.[49] *The Washington Times* reported the agency as saying it would "revive *massive* fines . . . against  a group of *high-profile* illegal immigrants who have taken sanctuary in churches across the country to resist their deportations."[50] Subsequently, several of the sanctuary leaders who had their fines withdrawn in October 2019 received new letters from ICE—this time threatening civil fines and criminal prosecution and requiring all of the sanctuary leaders to go to the respective ICE offices in their jurisdictions to present themselves for removal, departure, or for "continued cooperation with the Department of Homeland Security." Church and community members and/or lawyers attended many of these meetings in their stead.

64.     During one such meeting, an attorney asked ICE officials why her client had been targeted and was told that she was targeted for making herself "known" by drawing media attention to her case. This characterization echoes prior statements made by ICE officials, including a statement made by an ICE official over a telephone call with Patrick Shea, pro bono counsel to First Unitarian Church of Salt Lake City, on June 10, 2019. During this call, the ICE officer indicated that if Ms. Chávez and the church where she was living in sanctuary went into protective silence and there was no further public-facing media coverage, ICE would not take further action on her case.

65.     In February 2020, several organizations including Plaintiff FMP filed a Freedom of Information Act ("FOIA") lawsuit, *Austin Sanctuary Network et al. v. United States*

---

[49] Steven Dinan, EXCLUSIVE: *ICE revives six-figure fines against illegal immigrants living in sanctuary*, WASHINGTON TIMES, Dec. 7, 2019, https://www.washingtontimes.com/news/2019/dec/7/exclusive-ice-moves-revive-six-figure-fines-agains/.

[50] *Id.* (emphasis added).

*Immigration and Customs Enforcement et al.*, No. 20-cv-1686-LJL (S.D.N.Y. 2020), suing various agencies including ICE for more information about the civil immigration fines policy and the targeting of sanctuary leaders. The plaintiffs in the FOIA lawsuit, which includes ASN and FMP, held a press conference on February 26, 2020, describing the civil fines as "unprecedented", "retaliatory" and "punitive", criticizing the government's lack of transparency, and citing serious constitutional concerns with the imposition of the fines.[51] The press conference featured Ms. Espinal and Ms. Ramirez as speakers.

66.     The very day after the press conference, ICE issued Ms. Chavalán Sut, Ms. Chávez, Ms. Espinal, and Ms. Ramirez new notices of intent to fine of approximately $60,000 each.  Ms. Chavalán Sut received a fine in the amount of $59,925, while Ms. Chávez, Ms. Espinal, and Ms. Ramirez received fines in the amount of $59,126.

67.     Once again, Organizational Plaintiffs ASN, First Unitarian, and FMP also had to provide advocacy support to the sanctuary leaders who were fearful based on renewed enforcement, which pressured them to leave sanctuary. FMP and others also had to coordinate legal responses to the new fine notices, filing briefing contesting the fines in late April 2020 with ICE.

68.     On October 22, 2020, the FOIA plaintiffs including Organizational Plaintiffs ASN and FMP released a small subset of documents produced by ICE pursuant to the FOIA litigation.

---

[51] *See* Center for Constitutional Rights et al., *Immigrant Rights Groups Sue ICE for Immediate Release of Information Concerning the Continuing Retaliation Against Immigrants in Sanctuary,* Feb. 26, 2020, https://ccrjustice.org/home/press-center/press-releases/immigrant-rights-groups-sue-ice-immediate-release-information.

This release was accompanied by a press release[52] and briefing guide,[53] both of which highlight the retaliatory nature of the agency's civil fines policy against people in sanctuary.

69.     On October 28, 2020, the sanctuary leaders held a press conference to advocate for prosecutorial discretion for people in sanctuary. Three of the four individual plaintiffs spoke at the press conference from their places of worship.

70.     Within days of these events, in or around early November, 2020, ICE issued its decisions to assess the civil fines against at least four of the sanctuary leaders, including Individual Plaintiffs Ms. Chávez, Ms. Espinal, and Ms. Ramirez. As of the time of filing, Ms. Chavalán Sut had not received a new fine order. FMP continues to work with the lawyers of each of the sanctuary leaders to coordinate further defenses.

**The Civil Immigration Fines are Punitive and Excessive.**

71.     Ms. Chavalán Sut, Ms. Chávez, Ms. Espinal, and Ms. Ramirez are indigent and, as Defendants know or should know, have no reasonable prospect of paying approximately $60,000. Due to ICE's enforcement policies and the dangers they face if deported, Ms. Chavalán Sut, Ms. Chávez, and Ms. Ramirez were living in sanctuary with little or no income, already experiencing protracted financial precarity and hardship as a result of their inability to work outside of their churches. Ms. Espinal, who left sanctuary on February 18, 2021, after being granted an order of supervision by ICE, is awaiting an Employment Authorization Document that would enable her to support her family and received a prima facie determination letter for her VAWA self-petition

---

[52] Center for Constitutional Rights et al., *Sanctuary Leaders Release Documents Showing ICE's Plan to Roll Out Massive Civil Fines Against Undocumented Immigrants*, Oct. 22, 2020, https://ccrjustice.org/home/press-center/press-releases/sanctuary-leaders-release-documents-showing-ices-plan-roll-out.

[53] Center for Constitutional Rights, *Briefing Guide: FOIA Documents Reveal ICE's Use of Civil Fines to Target Immigrant Leaders in Sanctuary*, Oct. 22, 2020, https://ccrjustice.org/sites/default/files/attach/2020/10/Briefing%20Guide_%20ICE%20Sanctuary%20Fines%20FOIA_October%2022%202020.pdf.

dated February 3, 2021. Ms. Chávez also left sanctuary, on April 12 2021, after being granted a stay of removal and placement on an order of supervision. They all continue to rely on their churches, congregations, and local communities to meet their essential needs and, for Ms. Chávez, Ms. Espinal, and Ms. Ramirez, the needs of their young children. They have no way to meet their own material needs, much less pay the civil immigration fines, whether in the original amounts of $200,000-$500,000 or the subsequent amounts of around $60,000. Each of the fines was re-issued at roughly the same amount, further suggesting that Defendants are targeting Individual Plaintiffs.

72.    Defendants knew or should have known that these outrageous and extreme actions would cause severe distress. Each Individual Plaintiff has pursued immigration relief by seeking to reopen their asylum claims, appealing, or applying for stays of removal. The government, as the party both opposing and overseeing these cases, was aware of or should have been aware of the severe trauma the leaders have experienced in their home countries. The government's knowledge of these cases is evidenced by their communications where they discussed expecting media attention and that each leader was represented by counsel.[54] Despite knowing that each leader had been pursuing legal status and relief, the government publicly stated that they were imposing fines because the sanctuary leaders were "willfully" refusing to facilitate their own deportation by "conniving" and "conspiring."[55] Moreover, Defendants were aware of the Individual Plaintiffs' indigence through fee waiver applications and related filings submitted to the agency over the years. Thus, Defendants' conduct can only be described as extortive, coercive, and outrageous.

---

[54] *Supra* note 37.

[55] *Supra* note 36.

73.     Defendants' actions harm Plaintiffs' ability to advocate for sanctuary policies and force them to defend themselves against fines that would place them in significant debt and eliminate any possibility of financial security for their families.

74.     The Trump Administration  never identified any bona fide administrative purpose for imposing these fines against the sanctuary leaders. As retaliation for their religiously-based and high-profile activism, they were devised and pursued by Trump Administration officials with a specific purpose in mind: to punish.

75.      Prior to 2018, "in the rare instances when [fines] have been assessed, they have been lower, about $1,000," according to senior policy counsel for the American Immigrant Lawyers Association, Laura Lynch.[56] In fact, the government itself has identified that ICE, and formerly, INS, has never levied or collected fines under INA §§ 240B(d)(1) or 274D(a) and has not collected fines under INA § 274C(d)(3) since *Walters v. Reno*, 145 F.3d 1032 (9th Cir. 1998).[57]

76.     On April 23, 2021, DHS issued a fines rescission announcement and Secretary of Homeland Security Alejandro N. Mayorkas declared, "There is no indication that these penalties promoted compliance with noncitizens' departure obligations. We can enforce our immigration laws without resorting to ineffective and unnecessary punitive measures."[58]

---

[56] Maria Sacchetti and Davie Weigel, *ICE has detained or deported prominent immigration activists*, Wash. Post, Jan. 19, 2018, https://www.washingtonpost.com/powerpost/ice-has-detained-or-deported-foreigners-who-are-also-immigration-activists/2018/01/19/377af23a-fc95-11e7-a46b-a3614530bd87_story.html.

[57] Email from Adam V. Loiacono, USCIS OPLA Deputy Principal Legal Advisor for Enf't and Litig., to William Peachey, Dir. of the Off. of Immigr. Litig., Dep't of Just. Civ. Div. (July 2, 2018, 13:59 EST).

[58] *See* Press Release, U.S. Dep't of Homeland Sec., DHS Announces Rescission of Civil Penalties for Failure to Depart (Apr. 23, 2021) (https://www.dhs.gov/news/2021/04/23/dhs-announces-rescission-civil-penalties-failure-depart).

77.     The rescission came after analysis of data on the fines that demonstrated they were not effective and did not advance the interests of the agency.[59]

78.     Importantly, in their April 23, 2021 rescission announcement, DHS did not take the position that the recission was legally required. Moreover, the asserted statutory authorization to issue fines, INA §§ 240B and 274D, remain unchanged.

**Defendants' Coercive Actions Have Harmed Plaintiffs.**

79.     Defendants' retaliatory conduct, including the civil fines ordered against Individual Plaintiffs Ms. Chavalán Sut, Ms. Chávez, Ms. Espinal, and Ms. Ramirez, has caused Plaintiffs substantial mental anguish. The civil fines have caused the sanctuary leaders an enormous amount of anxiety and stress, coinciding with deterioration of their health.

80.     Receiving a fine in retaliation for being an indigenous person speaking out against injustice has been painful for Ms. Chavalán Sut and her family because it is a reminder of the government oppression they have already endured and has opened old wounds. The fines have made Ms. Chavalán Sut and her children feel depressed and anxious about what is to come if Ms. Chavalán Sut continues to speak out. Ms. Chavalán Sut's doctors reported that her traumatic symptoms returned when she received the fines, resulting in flashbacks of post traumatic memories, nightmares, sleep disturbance, hypervigilance, anxiety, and panic attacks as well as bodily symptoms of tightening of her chest, headaches, and tooth pain and decay. The fines reactivated symptoms related to her gastrointestinal and skin disorders that, in the past, were triggered by stress related to gang violence, requiring a second course of medication.

81.     Since receiving a fine, Ms. Chávez has experienced constant anxiety and worry over what ICE might do next to her and her daughters if she continues to speak out. She has

---

[59] *Id.*

trouble sleeping because she is worried that ICE will break into the church at any moment. She also suffers from migraines. Ms. Chávez's doctors reported that she struggles with anxiety, depression, and post-traumatic stress disorder and suffers from uncontrolled migraines, recurrent abdominal pain, fatigue, poor sleep, difficulty breathing, decreased ability to concentrate, and myalgias. They observed that these medical conditions and symptoms worsened significantly, resulting in increased therapeutic visits and increased doses and frequency of medications.

82.    Ms. Espinal has suffered panic attacks, anxiety, sudden crying, sleeping issues, and muscle tension due to the stress caused by the fines, which has deteriorated her mental health. The stress has led to physical problems as well, including migraines, chest pain, stomach pain, swelling in her legs, decreased appetite, difficulty falling and staying asleep, and nightmares. She is currently seeing a therapist to help her cope. Even after leaving sanctuary, she continues to suffer the stress of owing exorbitant fines.

83.    Ms. Ramirez has experienced and continues to experience anxiety and stress, migraines, loss of sleep, and jaw pain because of the civil fines and the amount of money she is being asked to pay. For some time, she required daily medication for her headaches and was prescribed antidepressants. Ms. Ramirez has discussed how the civil immigration fines have impacted her mental, emotional, and physical health with her therapist.

84.    The fear of additional civil immigration fines enforcement made it more difficult for Plaintiffs Ms. Chavalán Sut, Ms. Chávez, Ms. Espinal, and Ms. Ramirez to exercise their faith and organize other faith communities through the sanctuary movement, due to widespread fear among faith communities that such organizing will lead to further targeting. Defendants' actions harm Plaintiffs' ability to advocate for sanctuary policies and force them to defend themselves

against fines that would place them in significant debt and eliminate any possibility of financial security for their families.

85.     Receiving a fine in retaliation for being an indigenous person speaking out against injustice has been painful for Ms. Chavalán Sut and her family because it is a reminder of the government oppression they have already endured and has opened old wounds. The fines have made Ms. Chavalán Sut and her children depressed, which makes it difficult for her to advocate for the sanctuary movement. She is worried that she will die before she has justice.

86.     Prior to receiving the initial notice to fine, Ms. Chávez spoke with reporters for several news pieces about her case and the need for communities of faith to provide sanctuary, both in English and Spanish. After Ms. Chávez received her first Notice of Intention to Fine in the amount of approximately $453,000, she connected to other women in sanctuary who had received notices of fines in similar amounts, and she came to believe that she had been targeted for punishment by ICE for speaking out. For a time afterward, she declined to give additional interviews out of fear of what ICE might do to her next because she knew that the publicity surrounding her case was one of the motivating factors for ICE's decision to issue the fine. Since then, she has done most of her advocacy work through her lawyer and her supporters at her church. Ms. Chávez has maintained a much lower profile since Defendants issued her a fine and since the statement made by ICE to attorney Patrick Shea, as described above. Ms. Chávez has spoken out more recently about the National Sanctuary Collective's policy demands, but she remains very afraid of further retaliation.

87.     Defendants' targeting has caused Ms. Espinal serious distress, as she would face a risk of serious injury or death if deported. The fines have been particularly painful for Ms. Espinal because her inability to work while in sanctuary and resulting lack of financial resources

has already negatively impacted her children, who have put aside their hopes to attend college and culinary school for the time being due to cost. Although Ms. Espinal was vocal about her case when she first took sanctuary, ICE's targeting made her fearful of the consequences of being public about her case. As a result, she has become less outspoken: she does not give as many interviews as she used to, and is constantly grappling with how she can do what her faith calls her to do by speaking out publicly about her case while living in a state of constant worry. Even after leaving sanctuary, Ms. Espinal has kept her interviews to a minimum for fear of further retaliation from ICE.

88.     After being issued the civil fines, Ms. Ramirez fears for her life and the life of her child when she speaks publicly about sanctuary issues and her own case. She has also refused to give multiple interviews because of these fears caused by the civil immigration fines. She is concerned that ICE will continue to target her if she speaks out, not just through civil fines or other immigration consequences but also by portraying her negatively in the public eye, thereby encouraging others to say hateful things about her on social media.

89.     In addition, Plaintiffs fear that the civil immigration fine proceedings will prevent sanctuary leaders from supporting their families and lead to further adverse immigration, financial, and other consequences in the future.

90.     Defendants' retaliatory practices have also forced Plaintiffs ASN, First Unitarian, and FMP to divert significant resources to the protection and defense of sanctuary leaders from civil immigration fines at the cost of fulfilling their stated missions. In addition to the costs and burdens associated with diverting mission and resources to address this crisis in the sanctuary movement, ASN, First Unitarian, and FMP have incurred additional expenses such as medical, legal and interpretation costs.

91.     While ASN is a predominantly volunteer-run organization, the added work of responding to Defendants' targeting of sanctuary leaders required ASN to hire a paid organizer. ASN went from having no paid organizer in 2018 to paying one $6,400 in 2019 and $23,600 in 2020. ASN also incurred additional medical, legal, and simultaneous interpretation costs associated with supporting targeted sanctuary leaders. Their simultaneous interpretation costs went up from $4,680 in 2018 to $7,000 in 2019 and $7,733 in 2020.

92.     First Unitarian has diverted significant volunteer and staff time and church resources to supporting Ms. Chávez in response to ICE's targeting. They have organized roughly 200 volunteers to support Ms. Chávez, from picking up groceries and providing healthcare to organizing birthday parties and movie nights. A smaller subset of about nine to fourteen individuals have served on the Sanctuary Steering Committee since 2017, coordinating volunteers, security, legal services, media, and political advocacy.

93.     Supporting Ms. Chávez has required the diversion of significant time and resources for First Unitarian. Volunteers staff the church twenty-four hours a day, 365 days a year to provide security for Ms. Chávez. First Unitarian estimates that these volunteers have devoted at least 45,931 volunteer hours since January 30, 2018. This estimate does not include volunteer hours for other assistance, services, advocacy, interpretation, and coordination work. Because First Unitarian has prioritized supporting Ms. Chávez, the church's other social justice efforts have suffered. Staff who in the past have focused on other social justice efforts have diverted time and capacity to prioritize meeting sanctuary leaders' essential needs and coordinating meetings for the Collective.

94.     First Unitarian has also diverted funds to supporting Ms. Chávez in the context of the civil fines. After ICE issued Ms. Chávez a notice of intent to fine, the congregation solicited

donations from its members to raise $5,000 for legal expenses associated with challenging the notice. They also supported Ms. Chávez by bringing the public's attention to the fines. The congregation has contributed to stories in the local press, has collaborated with local grassroots organizations on press conferences and letter-writing campaigns, and has met with elected officials and other community organizations to seek their support. They also routinely pay for and coordinate interpretation for National Sanctuary Collective meetings.

95.     Witnessing the suffering and trauma the fines have caused Ms. Chávez has been a source of pain and trauma for First Unitarian's volunteers. First Unitarian has also been afraid that ICE would assess the fines against the church itself since it has offered Ms. Chávez sanctuary. After ICE issued Ms. Chávez the initial notice of intent to fine for about $450,000, Ms. Chávez felt so intimidated that she asked the church to abandon a plan for a strident media campaign that they had been planning for the occasion of Ms. Chávez's second anniversary in sanctuary. Out of respect and understanding of Ms. Chávez's fears, First Unitarian went silent for a time, even though this ran counter to the church's deep belief in principled public support of immigrants.

96.     Despite being a small organization with just two full-time staff members, FMP has coordinated the legal efforts of sanctuary leaders across the country since early 2018. In late summer 2019, FMP became the lead coordinator of sanctuary leaders' civil fines legal defense before ICE and the Board of Immigration Appeals ("BIA"). FMP is also currently responsible for Ms. Chávez's civil fines defense. In addition to their legal work, FMP works with sanctuary leaders and other organizations, including ASN and First Unitarian, to publicly advocate against Defendants' targeting of immigrants in sanctuary. ASN, First Unitarian, and FMP have co-drafted and published press releases, responded to media inquiries, coordinated social media

outreach, and helped coordinate multiple Congressional visits as part of this advocacy. FMP diverted significant time away from its other programs, including potential new client representation, to engage in legal and advocacy work in response to Defendants' conduct.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

**Violation of the First Amendment: Freedom of Speech and Association**
(All Plaintiffs Against All Defendants)

97.     Plaintiffs ASN, First Unitarian, FMP, Ms. Chavalán Sut, Ms. Chávez, Ms. Espinal, and Ms. Ramirez incorporate by reference each and every allegation contained in the paragraphs above.

98.     The First Amendment protects freedom of speech. Speech that concerns "political change" is "core political speech" and thus "trenches upon an area in which the importance of First Amendment protections is at its zenith." *Meyer v. Grant*, 486 U.S. 414, 421-22, 425 (1988).

99.     The First Amendment also protects freedom of association. The right to expressive association "is implicit in the right to engage in activities protected by the First Amendment." *Roberts v. Jaycees*, 468 U.S. 609, 622 (1984). To have a protectable right of expressive association, "a group must engage in some form of expression, whether it is public or private." *Boy Scouts of America v. Dale*, 530 U.S. 640, 648 (2000).

100.    Government action that targets private speech based on the viewpoint taken by the speaker is an egregious form of content discrimination and presumptively unconstitutional. *See Matal v. Tam*, 137 S. Ct. 1744 (2017). Similarly, government action that targets speech based on the identity of the speaker is presumptively unconstitutional. *See Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010).

101.    By individually and collectively speaking out about their decision to take sanctuary, advocating for sanctuary policies to protect immigrants from unjust immigration policies, and organizing faith communities, Individual Plaintiffs Ms. Chavalán Sut, Ms. Chávez, Ms. Espinal, and Ms. Ramirez have engaged and continue to engage in core political speech and exercise their associational rights. Individual Plaintiffs have spoken out about their decisions to take sanctuary and the need for people of faith and houses of worship to protect immigrants from the injustice of deportation policies. They have criticized U.S. immigration policies and advocated for change. In addition to their individual speech and advocacy, Individual Plaintiffs meet together and with other sanctuary leaders through regular calls and online meetings, with the support of Organizational Plaintiffs ASN, First Unitarian, FMP, and others. Individual Plaintiffs have written joint public statements and press releases, and have spoken out at events that they have led and organized. They have formed the National Sanctuary Collective to advocate for their families, communities, and immigrants nationwide.

102.    By issuing civil immigration fines—in exorbitant amounts and accompanied by notices to report to ICE offices for likely detention or deportation—against sanctuary leaders, Defendants' actions significantly affect the ability of Plaintiffs to advocate individually and collectively for sanctuary policies and organize faith communities. Defendants' discriminatory and retaliatory issuance of civil fines has instilled in the sanctuary leaders and faith communities an ongoing fear of reprisal that has chilled their ability to speak and associate freely. Defendants' actions harm Plaintiffs' ability to advocate for sanctuary policies and force them to defend sanctuary leaders against fines that would place them in significant debt and eliminate any possibility of financial security for their families. Defendants' actions have diverted

Organizational Plaintiffs from their advocacy for sanctuary policies in order to defend Individual Plaintiffs against these unjust fines.

103.    Defendants' actions in enforcing fines against sanctuary leaders would not have occurred but for their protected speech and conduct criticizing U.S. immigration policies. Defendants' actions target speech based on its viewpoint, content, and the identity of the speaker, and serves no compelling state interest.

## SECOND CLAIM FOR RELIEF

### Violation of the First Amendment: Freedom of Speech and Association— Retaliation
(All Plaintiffs Against All Defendants)

104.    Plaintiffs ASN, First Unitarian, FMP, Ms. Chavalán Sut, Ms. Chávez, Ms. Espinal, and Ms. Ramirez incorporate by reference each and every allegation contained in the paragraphs above.

105.    To establish a First Amendment retaliation claim, a plaintiff must show that (1) she engaged in conduct protected under the First Amendment; (2) the defendant took some retaliatory action sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again; and (3) a causal link between the exercise of a constitutional right and the adverse action taken against her. *See Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016).

106.    By individually and collectively speaking out about their decision to take sanctuary, advocating for sanctuary policies to protect immigrants from unjust immigration policies, and organizing faith communities, Individual Plaintiffs Ms. Chavalán Sut, Ms. Chávez, Ms. Espinal, and Ms. Ramirez have engaged and continue to engage in core political speech and exercise their associational rights. Individual Plaintiffs have spoken out about their decisions to take sanctuary and the need for people of faith and houses of worship to protect immigrants from the injustice of deportation policies. They have criticized U.S. immigration policies and advocated for change. In

addition to their individual speech and advocacy, Individual Plaintiffs meet together and with other sanctuary leaders through regular calls and online meetings, with the support of Organizational Plaintiffs ASN, First Unitarian, FMP, and others. Individual Plaintiffs have written joint public statements and press releases, and have spoken out at events that they have led and organized. They have formed the National Sanctuary Collective to advocate for their families, communities, and immigrants nationwide.

107.    Defendants' decision to target Individual Plaintiffs Ms. Chavalán Sut, Ms. Chávez, Ms. Espinal, and Ms. Ramirez for civil immigration fines is causally connected to their protected political speech and association. Defendants took specific steps to target people in sanctuary and, within that group, targeted individuals who have been outspoken leaders of the sanctuary movement, for civil immigration fines. These proximity of Defendants' retaliatory actions to Plaintiffs' exercise of their protected speech and conduct—including the issuances of notices and fine decisions following Plaintiffs' public events and communication with the press—is highly suggestive of Defendants' retaliatory intent. Moreover, the amount of fines Defendants are pursuing against sanctuary leaders is significantly higher than amounts issued to others, and Defendants have taken steps to publicize their efforts against sanctuary leaders in particular.

108.    Defendants' unlawful actions are imposing immediate and ongoing harm on Plaintiffs and have caused Plaintiffs deprivation of their constitutional rights. Defendants' retaliatory actions are sufficient to deter a person of ordinary firmness from exercising her constitutional rights. Defendants' discriminatory issuance of civil fines has instilled in the sanctuary leaders an ongoing fear of reprisal that has impeded their ability to speak and associate freely. Defendants' actions harm Plaintiffs' ability to advocate for sanctuary policies and force them to defend sanctuary leaders against fines that would place them in significant debt and

eliminate any possibility of financial security for their families. Defendants' actions have diverted Organizational Plaintiffs from their advocacy for sanctuary policies in order to defend Individual Plaintiffs against these unjust fines.

### THIRD CLAIM FOR RELIEF

**Violation of the First Amendment: Free Exercise of Religion**
(Organizational Plaintiffs ASN and First Unitarian and All Individual Plaintiffs Against All Defendants)

109.    Organizational Plaintiffs ASN and First Unitarian and Individual Plaintiffs Ms. Chavalán Sut, Ms. Chávez, Ms. Espinal, and Ms. Ramirez incorporate by reference each and every allegation contained in the paragraphs above.

110.    Under the Free Exercise Clause of the First Amendment, a governmental policy, custom, or practice that is not neutral and/or not of general applicability is presumptively unconstitutional and must be justified by a compelling governmental interest and narrowly tailored to advance that interest. Facial neutrality is not determinative. *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531–32 (1993). The Free Exercise Clause protects against "governmental hostility which is masked, as well as overt." *Id.* (internal quotations and citations omitted). Differential treatment between persons to whom the government's policy or practice may apply suggests non-neutrality. *See Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Com'n*, 138 S. Ct. 1719, 1732 (2018).

111.    Individual Plaintiffs have publicly taken sanctuary in a house of worship and advocate for sanctuary policies to protect immigrants from unjust immigration policies based on their deeply held religious beliefs. ASN and First Unitarian, organizationally and by and through its members, also advocate for sanctuary policies to protect immigrants from unjust immigration policies based on their deeply held religious beliefs. In so doing, Individual Plaintiffs and

Organizational Plaintiffs ASN and First Unitarian have exercised their First Amendment right to free exercise of religion.

112.   Defendants chose to target Individual Plaintiffs for civil immigration fines based on their public decision to take sanctuary in a house of worship and their advocacy, with ASN, First Unitarian, and others, for sanctuary policies to protect immigrants from unjust immigration policies based on their deeply held religious beliefs. Defendants continue to pursue fines on these bases.

113.   Defendants' actions are not neutral or generally applicable, as they are aimed at denying Individual Plaintiffs the ability to take sanctuary in a place of worship and denying Individual Plaintiffs and Organizational Plaintiffs ASN and First Unitarian—organizationally and by and through their members—the ability to organize faith communities to advocate in support of sanctuary policies. Defendants' actions are likewise not generally applicable because they grant immigration officials unbridled discretion to censor sanctuary leaders' and organizations' religious expression while permitting other immigrants and organizations to engage in non-religious expression.

114.   Defendants' actions—selecting individuals for differential treatment in the issuance and assessment of civil fines based on their free exercise of their sincerely held religious beliefs— serve no compelling state interest.  Defendants were influenced by Individual Plaintiffs' and ASN and First Unitarian's religious exercise in their decisions about which individuals to fine and how much money to fine them for. Individual Plaintiffs were targeted with larger fines than other immigrants with final removal orders who also received fines. Individual Plaintiffs also received fines when other immigrants in sanctuary who had final removal orders did not.

115.   Defendants' unlawful actions are imposing an immediate and ongoing harm on Individual Plaintiffs, First Unitarian, and ASN for their exercise of their constitutional right to freedom of religion, including by chilling their freedom of religious exercise, in violation of Individual Plaintiffs' and First Unitarian's and ASN's First Amendment rights under the United States Constitution. Defendants' actions significantly affect Individual Plaintiffs' and First Unitarian's and ASN's ability to advocate for sanctuary policies and organize their communities. Defendants' discriminatory issuance of civil fines has instilled in these Plaintiffs an ongoing fear of reprisal that has impeded their ability to freely exercise their religious beliefs.

116.   In addition to directly impeding the religious exercise of ASN and its members, Defendants' retaliatory practices have also forced ASN to divert significant resources to the protection and defense of sanctuary leaders from civil immigration fines at the cost of fulfilling its stated mission. ASN had planned to divert significant time to educating more congregations outside of Austin to join their work but was forced to abandon these plans in order to spend time supporting sanctuary leaders who received fine notices. ASN also suffered financial losses as a result of Defendants' conduct. While ASN is a predominantly volunteer-run organization, the added work of responding to Defendants' targeting of sanctuary leaders required ASN to hire a paid organizer. ASN also incurred additional medical, legal, and simultaneous interpretation costs associated with supporting targeted sanctuary leaders. This includes the resources it has diverted to support Ms. Ramirez, who resides at St. Andrew's Presbyterian Church, a member of ASN.

117.   In addition to directly impeding the religious exercise of First Unitarian and its members, Defendants' retaliatory practices have also forced the congregation to divert significant resources to the protection and defense of Ms. Chávez and other sanctuary leaders. Members of the congregation ensure that Ms. Chávez has the food and medical services she needs, provide

49

her with security at the church, and help her coordinate her response to ICE's targeting, from fundraising for legal expenses to meeting with elected officials. First Unitarian's work responding to the civil fines has come at the expense of their other social justice efforts; many of the volunteers working to support Ms. Chávez had previously been involved in other social justice campaigns, including the church's Social Justice Council and Environmental Ministry, but became less available for that work after ICE first issued notices of intent to fine.

## FOURTH CLAIM FOR RELIEF

### Violation of the Religious Freedom Restoration Act (RFRA)
(Organizational Plaintiffs ASN and First Unitarian and All Individual Plaintiffs against Defendants DHS, ICE, Mayorkas and Johnson, in their official capacities for declaratory and injunctive relief; and DHS Defendants Jane or John Does 1-6 and ICE Defendants Jane or John Does 7-12, in their official capacities for declaratory and injunctive relief and individual capacities for damages)

118.    Organizational Plaintiffs ASN and First Unitarian and Individual Plaintiffs Ms. Chavalán Sut, Ms. Chávez, Ms. Espinal, and Ms. Ramirez incorporate by reference each and every allegation contained in the paragraphs above.

119.    "In order to ensure broad protection for religious liberty, RFRA provides that 'Government shall not substantially burden a person's exercise of religion, even if the burden results from a rule of general applicability.'" *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 694–95 (2014) (concluding that the Affordable Care Act's contraceptive mandate for for-profit corporations violated RFRA because it substantially burdened corporations' sincerely held religious beliefs) (quoting 42 U.S.C. §§ 2000bb-1(a)).

120.    As amended by RLUIPA, RFRA defines the "exercise of religion" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc–5(7)(A) (2000). Congress has mandated that this concept "be construed in favor

of a broad protection of religious exercise, to the maximum extent permitted by the terms of this chapter and the Constitution." *Hobby Lobby*, 573 U.S. at 696.

121.    A court may find a substantial burden where it can identify direct or indirect coercion aimed at the exercise of a religious belief. *Hobby Lobby*, 573 U.S. at 726; *Thomas v. Review Bd. of Ind. Employment Sec. Div.*, 450 U.S. 707, 717–18 (1981).

122.    Sizable financial penalties can constitute a substantial burden to religious belief, including where the fines are intended to pressure recipients to violate their sincerely held religious belief. *Hobby Lobby*, 573 U.S at 726 (finding substantial burden because enormity of fines for defying the mandate pressured corporations to violate their belief against providing health insurance coverage for drugs that they perceived to be abortifacients).

123.    The targeted fines issued by the government burden ASN and First Unitarian, including their members, and Individual Plaintiffs Ms. Chavalán Sut, Ms. Chávez, Ms. Espinal, and Ms. Ramirez by pressuring them to cease actions that are motivated by their deeply held religious beliefs. ASN is a faith-based coalition that supports immigrants and participates in the broader, religiously grounded sanctuary movement. First Unitarian is a Unitarian Universalist church based in Salt Lake City that is committed to social justice. ASN, First Unitarian, and Individual Plaintiffs sincerely believe that they have a religious duty to advocate for sanctuary policies to protect themselves and their families, to participate in the sanctuary movement, and to call for broad protections for immigrants' rights. These are fundamental and important tenets of these Plaintiffs' religious beliefs because of the central roles that social justice and the family play in their religious communities.

124.    Defendants' targeting unjustly penalized Organizational Plaintiffs ASN and First Unitarian and Individual Plaintiffs for exercising their religious beliefs. As discussed above, ASN

and its members have been harmed due to the widespread fear that this targeting has created among individuals and faith communities, whom ASN and its members organize through ASN's work. In addition, ASN was forced to divert its resources from other projects to focus on supporting Ms. Ramirez and other sanctuary leaders in response to ICE's targeting, including by incurring additional organizing and interpretation costs. Similarly, First Unitarian and its members have been harmed due to the fear that this targeting has created among individuals and faith communities. The congregation is constantly concerned about how it will be able to help Ms. Chávez pay the fines or fight them in court, and worries whether speaking out against ICE's targeting will lead to further harm to Ms. Chávez. They have diverted resources from other projects to focus on supporting sanctuary leaders, and Ms. Chávez in particular, in response to ICE's targeting. The congregation has provided financial support in the form of money for Ms. Chávez's legal fees and additional money for interpretation services.

125. ICE's incredibly high financial penalties were meant to—and did—have a coercive effect on Individual Plaintiffs by pressuring them to leave sanctuary, separate from their families, and stop speaking out publicly about their cases, immigration policies, and the need for sanctuary policies. Ms. Chavalán Sut felt that the fines had opened up old wounds from government oppression that she and her family have endured, and the emotional toll has made it harder for her to speak out about the sanctuary movement for fear of what ICE might do to her next. Ms. Chávez had been public about her case before receiving the civil fines. Subsequently, for a time she declined to give additional interviews out of fear of what ICE might do to her next. Ms. Espinal also avoided media attention for a time after receiving a fine. She was terrified that ICE would continue to punish her and her family for advocating for the sanctuary movement. Since being issued the civil fines, Ms. Ramirez feels fear for her life and the life of her child when she speaks

publicly about sanctuary issues and her own case. She has also refused to give multiple interviews because of these fears caused by the civil fines.

126.    By forcing ASN and First Unitarian and Individual Plaintiffs into this impermissible choice between their sincerely held religious practices—including advocating for sanctuary policies to protect themselves, their families, and the sanctuary movement, and speaking out on behalf of the "least of these" through immigrants' rights advocacy—and the threat of retaliation and punishment, Defendants placed a substantial burden on these Plaintiffs' exercise of their sincerely held religious beliefs in violation of RFRA, 42 U.S.C. § 2000bb-1(a).

127.    Defendants have no compelling interest in targeting and silencing ASN, First Unitarian, and Individual Plaintiffs. These Plaintiffs were engaged in protected religious and political speech and conduct. Furthermore, Individual Plaintiffs are indigent and cannot pay the fines. Defendants' exorbitant and selective imposition of civil fines belies any compelling interest in immigration enforcement; Defendants specifically targeted individuals living in houses of worship who have been outspoken in their prayers, statements, and advocacy for sanctuary policies rather than all individuals who have allegedly failed to depart within the meaning of the statute. Nor is pursuing civil immigration fines against Individual Plaintiffs the least restrictive means through which the United States government can further any legitimate immigration policy interests.

128.    By attempting to fine Ms. Chavalán Sut, Ms. Chávez, Ms. Espinal, and Ms. Ramirez, Defendants infringed on ASN and First Unitarian's and Individual Plaintiffs' sincerely held religious exercise in violation of RFRA.

129.    The John or Jane Doe DHS and ICE officers were responsible for identifying, targeting and levying exorbitant fines against the Individual Plaintiffs and thereby imposing a

substantial burden on their religious beliefs.  As a result of these Defendants' violation of ASN's and Individual Plaintiffs' RFRA rights, ASN, First Unitarian, and the Individual Plaintiffs are entitled to damages from John or Jane Doe individual-capacity defendants. *Tanzin v. Tanvir*, 140 S. Ct. 550 (2020).

130.    Defendants' unlawful actions are imposing an immediate and ongoing harm on ASN, First Unitarian, and the Individual Plaintiffs and have caused Individual Plaintiffs mental anguish and damage to their reputation, and have caused ASN, First Unitarian and all Individual Plaintiffs deprivation of their statutory rights, along with material and economic loss.

## FIFTH CLAIM FOR RELIEF

**Violation of the Eighth Amendment: Excessive Fines**
(All Individual Plaintiffs against All Defendants)

131.    Individual Plaintiffs Ms. Chavalán Sut, Ms. Chávez, Ms. Espinal, and Ms. Ramirez incorporate by reference each and every allegation contained in the paragraphs above.

132.    The Excessive Fines Clause of the Eighth Amendment provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const., Amend. XVIII. To qualify as a "fine" for the purposes of the Excessive Fines Clause, a payment must be imposed by the government and be at least partially punitive in nature. *Browning-Ferris v. Kelco*, 492 U.S. 257, 265 (1989); *see also Timbs v. Indiana*, 139 S. Ct. 682, 689-690 (2019) (holding "civil in rem forfeitures are fines for purposes of the Eighth Amendment when they are at least partially punitive").

133.    A fine is excessive when it is "grossly disproportionate" to the "gravity of the defendant's offense." *United States v. Bajakajian*, 524 U.S. 321, 335, 227 (1998); *see also Timbs*, 139 S. Ct. at 688. Courts consider the individualized circumstances of the person fined; whether the person fined is among the class of persons for whom the statute was designed; the harm to the

government and the public caused by the underlying conduct being penalized; and the underlying maximum sentence. *Bajakajian*, 524 U.S. at 338. The context of the fine is also relevant. "Excessive fines can be used, for example, to retaliate against or chill the speech of political enemies…. [or as] a source of revenue…." *Timbs*, 139 S. Ct. at 689 (internal quotation marks and citation omitted).

134.     The civil immigration fines Defendants issued to Individual Plaintiffs are fines for the purposes of the Excessive Fines Clause because they are levied by a U.S. government agency and are punishment (here, for their failure to depart the U.S., in violation of immigration law). The initial 1-79B "Notice of Intention to Fine Under Section 274D of the Immigration and Nationality Act" Defendants sent to Individual Plaintiffs alleges that each failed to depart the U.S. and refused to present herself for deportation. Stephen Miller described such sanctions as "fines and penalties" in leaked emails, and President Trump spoke of ensuring "collection of all fines and penalties" in a post-*American Carnage* order, E.O. 13768 (Jan. 25, 2017). Furthermore, the plain language of the statute under which Defendants issued fines to Individual Plaintiffs portrays the penalties as punitive: the title of the statute is "Civil penalties for failure to depart", and the statutory text provides that the penalties are for failure "to depart the United States" or "present themselves for removal." INA § 274D(1)(A),(C), 8 U.S.C. § 1324d(1)(A),(C).

135.     The civil immigration fines Defendants' issued to Individual Plaintiffs are excessive under the Excessive Fines Clause in part because they are grossly disproportionate to the alleged offenses at issue, which are civil violations of U.S. immigration law and carry no criminal sentence. Any harm to the public or U.S. government due to sanctuary leaders' failure to leave the U.S. is minimal. Sanctuary leaders' presence and organizing for justice in the U.S., if anything, contributes to the public interest.

136.     The civil immigration fines are also excessive because Individual Plaintiffs are indigent. Due to ICE's enforcement policies and the dangers they face if deported, each is living in sanctuary with little or no income, already experiencing protracted financial precarity and hardship as a result of their inability to work outside of their churches. They rely on their churches, congregations, and local communities to meet their essential needs and, for Ms. Chávez, Ms. Espinal, and Ms. Ramirez, the needs of their young children. They have no way to meet their own material needs, much less pay the civil immigration fines, whether in the original amounts of $200,000-$500,000 or the subsequent amounts of around $60,000.

137.     Individual Plaintiffs are experiencing ongoing anxiety and fear that even if they were granted lawful permanent resident status or prosecutorial discretion, the fines could remain on their record. The Individual Plaintiffs fear that the fines could lead to adverse employment consequences and could saddle them with crushing debt.

138.     Defendants have used the excessive civil fines to "retaliate against or chill the speech of political enemies" and to serve "as a source of revenue," just as *Timbs* warned they might. 139 S. Ct. at 685. President Donald J. Trump has repeatedly disparaged the sanctuary movement, portraying advocates, particularly noncitizens, who call for sanctuary as his administration's "political enemies." Senior administration officials like Mr. Miller have explicitly connected the fines to funding the Trump administration's border wall project, writing: "So the fines and penalties can PAY for wall construction?" and later describing the strategy as "remarkable."[60]

---

[60] *See* AMERICAN OVERSIGHT, *In The Documents: Stephen Miller Emails With Justice Department Official About Anti-Immigration Measures*, July 23, 2020, https://www.americanoversight.org/in-the-documents-stephen-miller-email.

139.    The government has never identified and cannot identify any bona fide administrative purpose for these fines. They were devised and pursued by Trump Administration officials with a specific purpose in mind: to punish.

140.    The sheer magnitude of these fines; the minimal harm caused by their underlying offenses; the indigence of Individual Plaintiffs; and the presence of overt political and retaliatory motives on the part of Defendants and President Trump all signal that the civil immigration fines violate the Excessive Fines Clause.

141.    Defendants' unlawful actions are imposing immediate and ongoing harm on Plaintiffs and have caused Plaintiffs mental anguish, deprivation of their constitutional rights, damage to their reputation, and material and economic loss.

## SIXTH CLAIM FOR RELIEF

**Federal Torts Claims Act (FTCA) Claim for Intentional Infliction of Emotional Distress**
(All Individual Plaintiffs against Defendant United States)

142.    Individual Plaintiffs Ms. Chavalán Sut, Ms. Chávez, Ms. Espinal, and Ms. Ramirez incorporate by reference each and every allegation contained in the paragraphs above.

143.    Under the FTCA, the United States is liable for the tortious acts of its agents, employees, and officers. Under the relevant law, intentional infliction of emotional distress exists where: (1) defendant engaged in extreme (and intolerable) and outrageous conduct, which (2) intentionally or recklessly (3) caused the plaintiff severe emotional distress.[61]

144.    By issuing unprecedented exorbitant fines of approximately half a million dollars, Defendants intentionally or recklessly engaged in extreme and outrageous conduct that caused

---

[61] *See* *Smith v. United States*, 843 F.3d 509, 515 (D.C. Cir. 2016) (citing *Minch v. District of Columbia*, 952 A.2d 929, 940 (D.C. 2008)); *Viers v. Baker*, 841 S.E.2d 857, 863 (Va. 2020); *Twyman v. Twyman*, 855 S.W.2d 619, 621 (Tex. 1993); *Carlton v. Brown*, 323 P.3d 571, 584 (Utah Sup.Ct. 2014); *Yeager v. Local Union 20, Teamsters*, 453 N.E.2d 666, 671 (Ohio 1983).

plaintiffs to suffer emotional distress. Previously, ICE and formerly INS had never fined noncitizens under INA §§ 240B or 274D and the last fine under § 274C occurred in 1998. *See Walters v. Reno*, 145 F.3d 1032 (9th Cir. 1998). In the rare instances where fines have been imposed, they have usually not exceeded $1,000. The significant discrepancy between the past albeit rare practice of fining no more than thousand dollars and the recent decision to issue exorbitant fines of up to half a million dollars against the Individual Plaintiffs serves as further evidence of the goal of agency employees to intimidate and punish Plaintiffs. Rather than implementing this previously established practice, the Defendants chose to impose a disproportionate sum that they should have reasonably known virtually no one would be able to pay, much less indigent asylum-seekers. Upon review of the inherited civil fines program, the Biden Administration has identified the policy as an unnecessarily punitive measure.[62]

145.    As a direct and proximate result of Defendants' conduct, Individual Plaintiffs suffered severe distress that manifested itself in harmful physical consequences. Individual Plaintiffs' doctors and therapists have documented the exacerbation of anxiety, depression, and post-traumatic stress disorder and worsening physical symptoms resulting from the issuance of the fines.

146.    Plaintiffs are entitled to damages against the United States for intentional infliction of emotional distress to the full extent allowed under the relevant state or D.C. law and the FTCA, in the amount to be determined by the trier of fact.

147.    Under the FTCA, defendant United States of America is liable for these actions.

**PRAYER FOR RELIEF**

---

[62] *See* Press Release, U.S. Dep't of Homeland Sec., DHS Announces Rescission of Civil Penalties for Failure to Depart (Apr. 23, 2021) (https://www.dhs.gov/news/2021/04/23/dhs-announces-rescission-civil-penalties-failure-depart).

WHEREFORE, Plaintiffs respectfully request that this Court:

a.     Declare that Defendants' policy of retaliatory enforcement of civil immigration fines against people who have taken sanctuary and advocate for sanctuary policies and immigrant rights based on their deeply held religious briefs violates the First Amendment, RFRA, and the Eighth Amendment;

b.     Enter a permanent injunction restraining Defendants from selectively enforcing civil immigration fines against people based on their decision to take sanctuary and/or their advocacy for sanctuary policies and/or immigrant rights;

c.     Award Plaintiffs compensatory and nominal damages under RFRA;

d.     Award compensatory damages for the Plaintiffs' emotional distress under FTCA;

e.     Award Plaintiffs their costs and reasonable attorney's fees incurred in this action; and

f.     Grant any other and further relief, such as ordering Defendants to issue a formal apology to Plaintiffs, as this Court may deem just and proper.

A jury trial is demanded on claims I-V.


Dated: April 25, 2022                      Respectfully submitted,

Shayana D. Kadidal [D.C. Bar No. 454248]     /s/ *Alina Das*
Baher A. Azmy*                          Alina Das*
Rafaela Uribe*                           Lily Gutterman, Law Student
Center for Constitutional Rights           Jencey Paz, Law Student
666 Broadway, Floor 7                  NYU Immigrant Rights Clinic
New York, NY 10012                    Washington Square Legal Services
(212) 614-6438                          245 Sullivan Street, 5th Floor
kadidal@ccrjustice.org                 New York, NY 10012
                                       (347) 693-6485
                                       alina.das@nyu.edu


Sejal Zota [DC Bar No. NC020]
Dinesh McCoy*

Just Futures Law
95 Washington Street, Suite 104-149
Canton, MA 02021
sejal@justfutureslaw.org

* Motion for Pro Hac Vice Admission granted